570  A.2d  341

**Robert  Andrew  SAWYER,  et  al.**

v.

**Edwin  M.  HUMPHRIES.**

**No.  1483,  Sept.  Term,  1989.**

Court  of  Special  Appeals  of  Maryland.

March  1,  1990.

Certiorari  Granted  July  10,  1990.

Judith S. Stainbrook and Stephen P. Bourexis, Westminster, for appellants.

Millicent Edwards Gordon, Asst. Atty. Gen., Pikesville (J. Joseph Curran, Jr., Atty. Gen., Baltimore, on the brief), for appellee.

Argued before GILBERT, C.J., and MOYLAN and FISCHER, JJ.

GILBERT, Chief Judge.

*The Preface*

*"When constabulary duty's to be done, The policeman's lot is not a happy one."* [1]

*The Issue*

Having relied upon Sir William S. Gilbert to set the frame of reference of this appeal, we now consider the question: "When is a police officer a police officer?"

---

**1.** William Schwenck Gilbert (1836–1911), *Pirates of Penzance* (1874), act II.

## The Agreed Facts

Robert Andrew Sawyer and Dean Hundley sued Edwin M. Humphries in the Circuit Court for Carroll County. The thrust of the complaint was that the plaintiffs were assaulted and battered by Humphries on June 10, 1988. At the time of the incident, Humphries was a Maryland State Trooper, off duty, attired in civilian clothing, and operating his personal vehicle.

From the facts we infer that Sawyer and his passenger Hundley were driving behind Humphries on Route 31 near Westminster, Carroll County, Maryland. Humphries drove his vehicle onto the shoulder of the roadway, thus allowing Sawyer to pass. Humphries then re-entered Route 31, proceeding along his original route.

In the interim Sawyer turned off of Route 31 onto Stone Chapel Road, made a U-turn, and headed back toward Route 31. Humphries, in passing Stone Chapel Road, observed Sawyer at that intersection waiting to turn back onto Route 31. Humphries once again drove his vehicle onto the shoulder of the roadway, alit from the driver's side, and positioned himself near the back bumper of his automobile.

Sawyer's and Humphries's versions of the subsequent events are diametrically opposed to each other. Irrespective of which version is correct, it is undisputed that, as Sawyer's vehicle passed Humphries, the latter hurled a rock at Sawyer's car, striking and damaging the passengers' side of it. Sawyer then made a U-turn and stopped opposite Humphries. Sawyer then got out of his automobile, and both he and Humphries started toward each other. Sawyer contends that Humphries was armed with rocks. In self-defense, Sawyer says, he picked up a beer bottle from the roadway. Humphries, however, asserts that, as he approached Sawyer, the latter picked up a beer bottle and came toward him.

An altercation between the two ensued, resulting in the beer bottle's being forcibly taken from Sawyer. Mean-

while, during the struggle between Sawyer and Humphries, Hundley began to leave Sawyer's vehicle, apparently to aid Sawyer. Noticing Hundley's movements, Humphries ordered Hundley to stay in the car. Hundley obeyed.

It is not clear what next ensued. Nevertheless, Sawyer managed to return to his motor car and leave the scene with Hundley driving. Humphries re-entered his vehicle and proceeded to chase Sawyer's automobile. When Hundley stopped at a stop sign located at New Windsor Road,[2] Humphries stopped his car behind, got out, and approached the vehicle in which Hundley and Sawyer were seated. Humphries identified himself as a Maryland State Trooper. He placed Sawyer under arrest and detained him until an on-duty uniformed State Trooper arrived.

One day prior to the claim's being barred by the statute of limitations,[3] Sawyer and Hundley filed their complaint in the circuit court. Humphries, relying on Md. Rule 2–322, moved to dismiss the action. His motion was grounded on "lack of jurisdiction over the subject matter." Md. Rule 2–322(b)(1). Humphries asserted that he was, at the time of the incident, a Maryland State Trooper, acting within the scope of his employment. Therefore, he contended, if any claim were to be filed against him, it should have been brought in accordance with the Maryland Tort Claims Act, Md. State Gov't Code Ann. (State Gov't Article) §§ 12–101, *et seq.* Sawyer and Hundley averred that Humphries was acting as a citizen and not within the scope of his employment as a Maryland State Trooper. The motions judge, Luke K. Burns, agreed with Humphries, the case was dismissed, and this appeal ensued.

---

2. New Windsor Road is several miles from where the altercation occurred.

3. At the time of the incident, the Statute of Limitations on assault and battery was one year. "Battery" was eliminated from the one year proscription. 1989 Md.Laws, ch. 488, § 2. *See also* Md. Cts. & Jud. Proc.Code Ann. §§ 5–101 and 5–105.

*A Truncated History of the Maryland State Police*

The Maryland State Police were created pursuant to 1935 Md.Laws, ch. 303.[4] Its members are commonly known as troopers, and they have statewide law enforcement jurisdiction except in incorporated municipalities. Yet, even within those particular municipalities, the State Police possess certain limited jurisdiction. *See, e.g.,* Md.Ann.Code art. 88B, §§ 3, 4, 9, 10, and 13. The State Police exercise full police authority on land, water, and in the air within the territorial confines of Maryland. *See Maryland State Police Patrol Manual, 2d ed.,* Chapter 21, § 1–2, July 1989; *see also* Md.Ann.Code art. 88B, § 3.

The State Police are charged specifically with the duty of preserving the public peace, detecting and preventing crime, and enforcing the laws and ordinances of this State and its local subdivisions. Troopers "apprehend and arrest criminals and those who violated or are lawfully accused of violating such laws and ordinances," and they preserve order in public places. *Maryland Manual, 1989–90,* p. 374.

When a county of this State elects not to establish and maintain a county police force, that county may agree with the State Police that the latter shall function as the county police force. Those "resident trooper" agreements provide that the State Police, as represented by the resident trooper, shall

"enforce the public local laws of the county or municipality and perform related police services, in addition to . . . [their] other and regular duties. . . . For this purpose the Department shall provide such employees, buildings, and facilities as may be required by the agreement or, if not so required, as may be reasonable and proper in the discretion of the Department to perform the objects of the agreement."

---

4. The functions of the State Police are now codified in Md.Ann.Code art. 88B.

Md.Ann.Code art. 88B, § 63. Carroll County has no county police force. Therefore, under the authority of Md.Ann. Code art. 88B, § 63, above quoted, the county entered into a resident trooper agreement with the State Police.[5]

### The Law

All Maryland State Troopers are required to take an Oath of Office, which declares:

> "I do solemnly swear that I will bear true faith and allegiance to the United States of America and to the State of Maryland; that I will serve honestly and faithfully to uphold and defend the Constitution of the United States and the Constitution of Maryland; that I will enforce the laws of the State of Maryland; and that I will obey the orders of the Governor and of the officers appointed over me according to the rules and regulations of the Maryland State Police."

The oath is silent as to when a trooper is "on duty" or "off duty." It does, however, without qualification, command that the trooper "will enforce the laws of the State...."

We observe that the trooper's oath does not, as the appellants seem to imply, limit enforcement of State laws or local ordinances to prescribed or delineated hours, times, or places.

The trooper, upon being sworn as a law enforcement officer, becomes part of a cohesive group of men and women whose lives virtually revolve around each other. Troopers are required to conduct themselves "at all times, both on and off duty, in a manner which reflects most favorably on the" State Police, *Maryland State Police Administrative Manual, 2d ed.*, July 1989, Chapter 5, § 1(3–1), maintaining "a level of moral conduct in ... [their]

---

**5.** Carroll County, at present, has 41 resident troopers. For details of specific subdivision strength, as well as reference to the other counties who participate in the resident trooper program, see the Maryland State Police publication, "State Aid for Police Protection Fund, 1989."

personal affairs which is in keeping with the highest standards of the law enforcement profession." *Id.* at § 1(8–0).

Justice Sydney H. Asch[6] wrote in *Police Authority and the Rights of the Individual*, p. 35 (1968):

> "The nature of a policeman's life, out of uniform, does not substantially strengthen his ties with the rest of the community. While on duty, the policeman must condition himself not to inject his private personality into the performance of his job. *But the policeman in America is considered to be on duty twenty-four hours a day, seven days a week.* As a consequence, he is always on 'good behavior.' He cannot entirely give himself to his own interests and his own life. His friends always feel the shadow of the policeman's official position darkening their relationship.[7] The officer's personal life is hedged with restrictions as to associations and activities. These limitations are designed to restrict him from corruption, compromising situations, or the appearance of either. *He is at the call of neighbors, more than other persons, much as the physician is.*"

(Emphasis supplied.)

Despite Justice Asch's unequivocal declaration that police officers in America are "considered to be on duty twenty-

---

**6.** Justice Asch is a justice of the Supreme Court of New York, Appellate Division, 1st Department.

**7.** Perhaps Rudyard B. Kipling in his ballad, "Tommy," even though speaking of peacetime soldiers, *vis-a-vis* those in time of war, best expressed the lot of police officers. Kipling, writing about Tommy Atkins, a British enlisted soldier, said, "O, it's thank you 'Mr. Atkins' when the band begins to play." In the same ballad, he penned:
"For it's Tommy this, an' Tommy that, an' 'Chuck him out, the brute!'
But it's 'Saviour of 'is country' when the guns begin to shoot;
An' it's Tommy this, an' Tommy that, an' anything you please;
An' Tommy ain't a bloomin' fool—you bet that Tommy sees!"
It is not known whether Tommy Atkins was an ancestor of a judge of the Court of Appeals of Maryland, and we express no opinion thereon.

four hours a day, seven days a week," there is a paucity of written authority to support him. Nevertheless, it seems that most people assume the truth of the saw, and the accuracy *vel non* of Asch's statement is meaningless in light of its general acceptance as true.

Irrespective of how one views Justice Asch's assertion, the State Police Patrol Manual, § 2–1(a) provides: "Employees of the Agency sworn as *police officers of the State of Maryland are considered to be available for duty at all times.*" Moreover, off-duty troopers must carry their badge or State Police Identification Card and, at their option, *may* carry an issued or approved firearm. *See Maryland State Police Manual, supra,* Chapter 22, § II(2–1); *Maryland State Police Administrative Manual, supra,* Chapter 5, § I(26–0). The failure of a trooper to take appropriate action, either on duty or off duty, when matters arise over which the State Police have jurisdiction "is considered neglect of duty." *Id.* at Chapter 5, § I(28–3).

The State Police Manuals are authorized statements of policy. Md.Ann.Code art. 88B, § 15(a) confers upon the Superintendent of the State Police "the power to make *any rules* necessary to promote the effective and efficient performance of the duties of the Department and to insure the good government of the Department and its employees." (Emphasis supplied.) We interpret the Manuals to be composed of a series of rules governing a State Trooper's conduct. Those rules are promulgated by the Superintendent under the delegation of authority contained in § 15(a).

Sir William Blackstone in his well-known *Commentaries on the Laws of England* has written that constables, the ancestors of today's police officer, might in "walled towns" appoint "watchmen" to keep watch "to apprehend all rogues, vagabonds, and night-walkers and make them give an account of themselves." The watchmen, during their watch, had "the authority of the principal [constable]." Implicit in that statement, we think, is the rational inference

that the constable, of necessity, was always on duty. 1 W. Blackstone, *Commentaries* \*357.

We have not been directed by counsel to any cases dealing with the issue at hand. Notwithstanding that lack of guidance, we have, however, found authority in other States.

The Supreme Court of New York, Appellate Division, addressed the matter in *Hanmer v. Wells Fargo and Co. Express*, 174 A.D. 724, 160 N.Y.S. 651 (1916). There, the court, holding that police officers are not entitled to rewards because they are, in effect, always on duty, said: "Public officers such as policemen, constables, etc., are under a *special duty at all times,* because of the nature of their employment, to use their best efforts to apprehend criminals...." *Hanmer,* 160 N.Y.S. at 654 (emphasis supplied). *See also Kick v. Merry,* 23 Mo. 72, 66 Am.Dec. 658 (1856); *Lees v. Colgan,* 120 Cal. 262, 52 P. 502, 40 L.R.A. 355 (1898).

Similarly, in *People v. Derby,* 177 C.A.2d 626, 2 Cal.Rptr. 401 (1960), the California courts were called upon to determine the scope of the California Highway Patrol in effectuating an arrest of a person for a breach of the peace. The court held that members of the Highway Patrol are not required to ignore criminal activity after their particular hours of duty had been completed. Looking for authority for their holding, the court turned to the Motor Vehicle Code of California, which stated, in pertinent part:

"For the purpose of determining the scope of employment of any member of the California Highway Patrol under the workers' compensation laws, any such member shall be deemed to be on duty and acting within the scope of the person's employment when actually exercising any of the powers or performing any of the duties imposed or authorized by law at any time during the 24 hours of the day."

Cal.Veh.Code § 2253 (West 1989).[8]

The California Supreme Court discussed the question in *Cervantez v. J.C. Penney Co., Inc.*, 24 Cal.3d 579, 156 Cal.Rptr. 198, 595 P.2d 975 (1979). There, the court said that, if a peace officer takes on secondary employment, the employment prevents him from acting in what would otherwise be his official capacity. The court made crystalline that only the private employment would convert a police officer into a private citizen:

"[I]t is thus the fact of private employment which operates to prevent a peace officer from acting in what would otherwise be his official capacity. We do not suggest that a peace officer's official duties necessarily cease at the end of his normal working hours (cf. *People v. Derby* (1960) 177 Cal.App.2d 626, 630–631, 2 Cal.Rptr. 401) where there are no private contractual duties of the nature involved in this case. (See *People v. Corey, supra*, 21 Cal.3d [738] at p. 746, 147 Cal.Rptr. 639, 581 P.2d 644.) We disapprove *Dowdell v. Owl Drug Co.* (1932) 121 Cal.App. 316, 8 P.2d 890 and *People v. Millard* (1971) 15 Cal.App. 3d 759, 93 Cal.Rptr. 402, to the extent they are inconsistent with this opinion."

*Cervantez*, 156 Cal.Rptr. at 203, 595 P.2d at 980. *See also People v. Wittig*, 158 Cal.App.3d 124, 204 Cal.Rptr. 378 (1984). *But see State v. Childs*, 269 N.W.2d 25 (Minn.1978).

Illinois discussed a police officer's being on duty and off duty in *Banks v. City of Chicago*, 11 Ill.App.3d 543, 297 N.E.2d 343 (1973). The court stated:

"The nature of a policeman's job is that he be fit and armed at all times, whether on or off duty, and subject to respond to any call to enforce the laws and preserve the peace. It is true that his being considered 'on duty' at all hours of the day or night does not result in all of his acts being deemed to have been taken in the performance of his duties as a police officer. (*Karas v. Snell*, 11 Ill.2d

---

8. This section is unchanged from the 1959 code section which was quoted in *Derby*.

233, 142 N.E.2d 46.) However, since he is always obligated to attempt to prevent the commission of crime in his presence, any action taken by him toward that end, even in his official off-duty hours, falls within the performance of his duties as a police officer."

*Banks,* 11 Ill.App.3d at 550, 297 N.E.2d 343.

The same court stated in *Dzing v. City of Chicago,* 84 Ill.App.3d 704, 40 Ill.Dec. 420, 406 N.E.2d 121 (1980), that "[police] officers are required to be armed at all times, whether on or off duty and subject to respond to any call to enforce the laws and preserve the peace. We noted in *Banks v. City of Chicago* (1973), 11 Ill.App.3d 543, 550, 297 N.E.2d 343, 349, that 'It is true that his being considered "on duty" at all hours of the day or night does not result in all of his acts being deemed to have been taken in the performance of his duties as a police officer.' For this reason a municipality was held not liable for the conduct of a police officer who intentionally threatened to kill and did kill complainant's son so as to cause complainant great emotional distress. (*Nelson v. Nuccio* [131 Ill.App.2d 261, 268 N.E.2d 543 (1971) ].) Outrageous conduct such as that was outside the scope of the officer's employment. Likewise, police officers were held not acting within the scope of their employment when they allegedly committed torts of false arrest, false imprisonment and sexual assault, even though their status as police officers was what enabled them to retain custody of the complainant. *Gambling v. Cornish* (N.D.Ill.1977), 426 F.Supp. 1153. [ (1977) ]"

*Dzing,* 84 Ill.App.3d at 706–07, 40 Ill.Dec. 420, 406 N.E.2d 121.

The Commonwealth Court of Pennsylvania ruled in *City of Pittsburgh v. Workmen's Compensation Appeal Board,* 108 Pa.Comm. 477, 529 A.2d 1196 (1987), that any injured officer acting in the scope of employment was entitled to compensation. The court noted, "[W]e would [be] loath to hold that claimant [an off-duty police officer] should sit by idly while a fellow officer must fend for himself against a

crowd of ruffians because he would go uncompensated if seriously injured because of his entry into a fracas." *City of Pittsburgh*, 529 A.2d at 1197.

Atlantic City police officers were declared in *Connell v. Board of Review*, 216 N.J.Super. 403, 523 A.2d 1099 (1987), to be on duty twenty-four hours a day. Affirming the New Jersey Board of Review, the Superior Court opined:

> "We agree with the board's conclusion that the regulations of the Atlantic City Police Department provide that its members 'are always subject to duty although periodically relieved of its routine duties.' *Atlantic City Police Reg.* 3:1–6. Its officers are required to be armed and carry identification at all times. By law they are empowered to make arrests for crimes committed in their presence anywhere in the State. N.J.S.A. 40A:14–152.1."

*Connell*, 523 A.2d at 1102.

The Georgia appellate court said, "[A]ll law enforcement officers have the general duty to enforce the law and maintain the peace. They carry this duty *twenty-four hours a day, on and off duty.*" (Emphasis supplied.) *Duncan v. State*, 163 Ga.App. 148, 294 S.E.2d 365 (1982).

"A duly commissioned police officer," the Ohio Court of Appeals penned, is "a public office[r] upon a continuing basis. The officer here remained an officer of the law, and his obligation to preserve the peace was not nullified by the fact he was working for Kroger in this case." *State v. Glover*, 52 Ohio App.2d 35, 38, 367 N.E.2d 1202, 6 Ohio Op.3d 20 (1976).

The Minnesota Supreme Court held in *State v. Childs*, 269 N.W.2d 25 (1978), that a city police officer, working off duty as a private security officer, served a dual capacity. The officer was both the merchant's employee and a peace officer whose duty as a peace officer was to arrest persons suspected of shoplifting.

■ Based on the foregoing discussion, we hold that an employee of the Maryland State Police, who is sworn as a

police officer, is for police purposes on duty twenty-four hours a day, seven days a week, fifty-two weeks a year.

Since Trooper Humphries acted as a law enforcement officer, at the time of the incident about which Sawyer and Hundley complain, he was under the umbrella of the Maryland Tort Claims Act, State Gov't Article §§ 12–101 to 12–110, inclusive. Specifically, § 12–105(a) of that Act confers immunity upon State employees who are acting "within the scope of the public duties of the State personnel and ... without malice or gross negligence, and for which the State or its units have waived immunity under this subtitle, even if damages exceed the limits of that waiver." [9]

Because the trooper was within the ambit of the Act, it was necessary for the appellants, in order to recover from the State, not only to prove their case at trial but to place the State Treasurer on notice within the time prescription of the Act itself.[10]

Our holding that Trooper Humphries was on duty and acting within the scope of his employment does not, however, end our discourse. State Gov't Article, § 12–105(a) excludes from immunity malice or gross negligence. If Humphries's conduct was either malicious or grossly negligent, the State would fold its protective umbrella and expose Humphries to both self-help and a personally fi-

---

**9.** Interestingly, we think police officers have been protected to some extent against civil actions since at least the Statute of 24 Geo. II., c. 44, §§ 6 and 8 (1751). That ancient statute contained a six month period of limitation for any action brought against a constable. 24 Geo. II c. 44 § 8. Compare State Gov't Article, § 12–106(b)(1).

**10.** State Gov't Article, § 12–106(b) provides:
"(b) ....—A claimant may not institute an action under this subtitle unless:
(1) the claimant submits a written claim to the Treasurer or a designee of the Treasurer within 180 days after the injury to person or property that is the basis of the claim;
(2) the Treasurer or designee denies the claim finally; and
(3) the action is filed within 1 year after the claim is denied finally or 3 years after the cause of action arises, whichever is later."

nanced defense of the claim. *Elliott v. Kupferman,* 58 Md.App. 510, 527, 473 A.2d 960, 528 (1984).

Sawyer and Hundley allege in their complaint that

"23. By throwing a rock at the passenger side of Plaintiff Sawyer's vehicle, Defendant [Humphries] unlawfully and maliciously intended to cause harmful contact with Plaintiff Hundley or to cause Plaintiff Hundley to have fear of such harmful contact.

24. Plaintiff Hundley was reasonably put in fear of imminent bodily harm.

. . . .

26. By throwing a rock at the passenger side of Plaintiff Sawyer's vehicle, Defendant [Humphries] unlawfully and maliciously intended to attempt to cause harmful contact with Plaintiff Sawyer or to cause Plaintiff Sawyer to have fear of such harmful contact.

27. Plaintiff Sawyer was reasonably put in fear of imminent bodily harm.

. . . .

29. By willfully, maliciously and intentionally taking hold of Plaintiff Sawyer, pulling his hair and striking him repeatedly, Defendant [Humphries] deliberately caused harm to Plaintiff Sawyer.

. . . .

31. By moving toward Plaintiff Sawyer and by raising his hand to physically attack [sic] him, Defendant [Humphries] maliciously intended to do immediate bodily harm to Plaintiff and placed Plaintiff in fear of such immediate harm.

. . . .

36. By striking Plaintiff Sawyer across the chest while he was strapped into the passenger's seat, Defendant [Humphries] wil[l]fully, maliciously and intentionally caused harm to Plaintiff Sawyer.

. . . .

38. Defendant's [Humphries's] intentional actions in taking hold of Plaintiff Sawyer and repeatedly attempting to

remove him from his vehicle while he was strapped into the passenger's seat were willful and malicious and were offensive and caused harm to Plaintiff Sawyer."

Common to all of the above allegations is the assertion that Humphries acted with malicious intent.

Malice is defined as the intentional doing of a wrongful act without just cause, excuse, or justification which is reasonably calculated to injure another. *Black's Law Dictionary* (rev. 5th ed. 1979).

Our review of the agreed facts and complaint reveals that the allegations of Sawyer and Hundley do not set out a case that ousts Humphries from the coverage of the Maryland Tort Claims Act.

■ Bald allegations of malice or gross negligence, absent more, are not sufficient to remove the immunity protective umbrella from police officers. To allow bald allegations to serve to close the immunity umbrella would, in effect, render all law enforcement officers susceptible to the pleader's pen. Moreover, the purpose of the statute would be frustrated if a police officer would be fiscally penalized by having to defend himself or herself against bald allegations of malice or gross negligence. When the Legislature enacted the exception to immunity contained in State Gov't Article, § 12–105(a), it never intended that a State employee be deprived of immunity and called upon to bear the costs of his or her defense simply because the complaint contained the words "malice or gross negligence." We think Trooper Humphries was entitled to "the whole nine yards" insofar as immunity is concerned.

We iterate what was said in *Boyer v. State*, 80 Md.App. 101, 560 A.2d 48 (1989), *cert. granted*, 317 Md. 641, 566 A.2d 102 (1989):

"When performing the job of a law enforcement officer, the exercise of discretion may call for decisiveness and action in response to crises. *Bradshaw* [*v. Prince George's County*], 284 Md. [294] at 304 [396 A.2d 255] [1979]. A police officer's presently difficult job would be

nearly impossible if every act committed in a non-malicious, discretionary manner would become the basis of a law suit. Were that to occur, we would in effect be placing handcuffs on the officers, not the culprits."

*Boyer,* 80 Md.App. at 106, 560 A.2d 48.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANTS.