730 A.2d 774

James LOVELACE, Individually, etc.

v.

Kenneth ANDERSON, et al.

No. 1249, Sept. Term, 1998.

Court of Special Appeals of Maryland.

June 3, 1999.

674

Stanley H. Katz (John N. Spector, P.A., on brief), Baltimore, for appellant.

Sara Angeletti, Asst. City Solicitor, Baltimore, for appellee, Anderson.

Bernard Ilkhanoff, Asst. City Solicitor, Baltimore, for appellees, Frazier, State of Maryland, and Baltimore City Police Dept.

Mark T. Mixter (Debra B. Cruz, on the brief), Baltimore, for appellee, Sterling Hotel.

William R. Phelan, Jr., Principal Counsel (Frank C. Derr, Deputy City Solicitor, on the brief), Baltimore, for appellee, Mayor and City Co.

James J. Bresnicky (Jordan, Coyne and Savits, L.L.P., on the brief), Washington, DC, for appellee, Sage Hospitality.

Argued before HARRELL, EYLER and ADKINS, JJ.

ADKINS, Judge.

This is an appeal by James Lovelace, appellant, from adverse judgments entered by the Circuit Court for Baltimore County (Fader, J.) granting motions for summary judgment in favor of Kenneth Anderson, Sterling Hotel, Inc., d/b/a Days Inn West Baltimore (Sterling), and Sage Hospitality Resources, Inc., d/b/a Days Inn West Baltimore (Sage), and granting motions to dismiss in favor of the State of Maryland, the Mayor and City Council of Baltimore (MCCB), Police Commissioner Thomas C. Frazier, and the Baltimore City Police Department (BCPD). Appellant timely noted this appeal.

Because the issues presented can be best understood in their factual contexts, we begin with a statement of the essential facts.

## FACTS AND LEGAL PROCEEDINGS

On December 2, 1993, at approximately 8:00 p.m., a shooting occurred at the Days Inn West Baltimore hotel located on Security Boulevard in Baltimore County, Maryland. At that time, Anderson, an off-duty Baltimore City police officer hired by the hotel management company, Sage, was working as a security guard for the hotel. Anderson was dressed in plain clothes and carried a handgun issued by BCPD, his BCPD badge, and a BCPD identification card. Anderson had previously been approved for this secondary employment. By virtue of deposition testimony and a surveillance videotape

that captured the events,[1] many of the facts about what occurred on the evening of the shooting are undisputed. In our summary below, all facts were undisputed, unless we specifically state otherwise.

While seated in the hotel lobby, Anderson observed two men, later identified as Randy Terry and John Earl Jennings,[2] enter the lobby of the hotel. Upon entering, the two men proceeded to the front desk and attempted to rob the hotel desk clerk, Michael Gordon. Lovelace, an elderly man who was a guest at the hotel, was standing at the opposite end of the front desk. The two suspects were facing the desk clerk with their backs to the lobby seating area. One of the men pulled a sawed-off shotgun from under his coat and pointed it at Gordon. It is disputed as to whether the suspects announced a hold-up. Anderson began to rise and draw his departmental service weapon.

At this point, because the video is unclear[3] and does not have audio, there is conflicting evidence as to the exact sequence of events culminating in the gun battle.[4] Anderson says that he shouted, "Police!" as he drew his weapon. Next, Anderson says he was fired upon by Terry, causing the loss of fingers from his left hand. Anderson returned the fire. Terry and Lovelace say that they did not hear Anderson yell, "Police!" They also say that the gun battle began as a result of Anderson firing upon Terry first.

---

1. The videotape was introduced as an exhibit to the motion for summary judgment and is part of the record on appeal.

2. John Earl Jennings is referred to as either Mr. Earl or Mr. Jennings at various points in the record and briefs. We shall refer to him as Jennings in this opinion.

3. The surveillance video presents a recording from two stationary cameras. The image switches from one camera recording action directly in front of the desk to a second camera recording events inside the lobby near the entrance to the hotel.

4. The testimony from which we discern the facts occurred at depositions of Anderson, Lovelace, and Terry.

It is undisputed that Jennings, who was injured at the time, and Lovelace, who was uninjured at the time, both fell to the ground. Terry testified, without dispute, that he fired at Anderson with a .357 Magnum handgun six times, and when Jennings fell down, Terry retrieved his shotgun and fired that at Anderson twice. According to Terry, the gun battle lasted approximately five to six minutes. Terry then staggered out of the front door. Anderson shot Jennings in the head, killing him.

At some point during the battle, prior to the shot that killed Jennings, a bullet from Anderson's gun ricocheted and injured Lovelace. The bullet traveled through his big toe and into his ankle on the other leg. Lovelace stated in his deposition that when he fell to the ground, his foot was approximately twelve inches from Jennings's head. Anderson discharged twelve rounds in less than three seconds and stated he was shooting with "tunnel vision" and lost sight of Lovelace. The only things he could see were the shotgun and the two suspects.

Terry testified at a deposition that he walked into the same hotel lobby a month prior to this shooting and robbed a hotel clerk. He said that no weapons were drawn that time because the clerk simply handed over the money. He testified that his intention in entering the second time was to rob the clerk just as he had done on the previous occasion.

To complicate matters, ownership of the hotel changed hands on the day in question. By court order dated December 1, 1993, the Circuit Court for Baltimore County granted a Petition for Substituted Purchaser and ordered that Sterling be substituted as purchaser of the hotel. The Substituted Trustee's Deed was executed on December 2, 1993. Sage managed the hotel property up until some point on December 2. The closing of the transaction took place just hours prior to the shooting, which occurred at approximately 8:10 p.m. Sage claims that its management agreement was to be terminated upon consummation of the sale and transfer of the property, but allowed certain items to be resolved after closing. Anderson punched in two time cards on December 2, and was

paid partially by Sage and partially by Sterling for his service on that day.

As a result of the above incident, Lovelace filed a complaint against Anderson alleging that his December 2 conduct was negligent or grossly negligent. Lovelace also sued Sage and Sterling. Lovelace subsequently filed an amended complaint and a second amended complaint adding MCCB, BCPD, Frazier, and the State as defendants. Following transfer of the case to Baltimore County, the court granted MCCB's motion to dismiss on September 3, 1996. On October 15, 1996, the court granted the State's motion to dismiss. On January 7, 1997, the court granted BCPD's motion to dismiss. On February 20, 1997, the court granted Frazier's motion to dismiss.

The remaining defendants were Anderson, Sage, and Sterling. The trial court entered its judgment on June 12, 1998, and determined that Anderson was entitled to immunity as a police officer at the time that he drew his weapon and intervened on behalf of the victims of the armed robbery. The court also determined that there was no genuine dispute as to any material facts. As a result, summary judgment was granted in favor of Anderson.

Additionally, the court granted summary judgment in favor of Sterling and Sage. The court stated that "[n]o facts have been presented in opposition ... to show action by Anderson that was intentional, with malice or gross negligence." With regard to Sage, the court found no evidence to support the existence of an agent, servant and/or employee relationship between Sage and Anderson. With regard to Sterling, the court extended Anderson's immunity to it and granted its motion for summary judgment in part by finding that Sterling was immune from suit. The court, however, denied in part Sterling's motion requesting that the court determine that there was no employment relationship between Sterling and Anderson at the time of the shootings.

Judgment as to all parties was entered on June 12, 1998, and Lovelace timely noted this appeal. Additional facts will be added below as necessary to supplement our discussion.

## ISSUES

Appellant asks us to determine whether the trial court incorrectly shifted the burden to him when Anderson failed to show an absence of material facts in dispute and failed to identify the statute on which his immunity was based. Appellant also asks us to determine whether the trial court erred in: 1) deciding the scope of Anderson's employment as a matter of law; 2) determining the issue of immunity prior to trial; 3) failing to find a waiver of immunity; and 4) extending the immunity granted to Anderson to his hotel employer. Cross-appellant Sterling requests that we modify the trial court's order to remove the reference to Anderson "working as a security guard" at the time of the shooting.

Appellees argue that the trial court was correct in disposing of appellant's claims. We agree. With regard to Sterling's cross-appeal, we decline to modify the circuit court order because Sterling did not assert the existence or possibility of any adverse prejudice as a result of the order.

## DISCUSSION

### I.

### Standard of Review

First, we set forth our standard of review for summary judgment. Maryland Rule 2–501(e) provides that a court may grant a motion for summary judgment "in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." In considering a motion for summary judgment, the trial court does not determine any disputed facts, but instead rules on the motion as a matter of law. *See Southland Corp. v. Griffith,* 332 Md. 704, 712, 633 A.2d 84 (1993); *White v. Friel,* 210 Md. 274, 285, 123 A.2d 303 (1956). The court views the facts, including all inferences, in the light most favorable to the party against whom the court grants the judgment. *See Beard v. American Agency Life*

*Ins. Co.*, 314 Md. 235, 246, 550 A.2d 677 (1988). We are confined ordinarily to the basis relied on by the trial court in our review. *See Warner v. German*, 100 Md.App. 512, 517, 642 A.2d 239 (1994).

We are also reviewing the granting of motions to dismiss. "In analyzing a motion to dismiss, the trial court must decide whether the complaint states a claim, assuming the truth of all well-pleaded facts in the complaint and taking all inferences from those facts in the light most favorable to the plaintiff." *Boyd v. Hickman*, 114 Md.App. 108, 117, 689 A.2d 106, *cert. denied*, 346 Md. 26, 694 A.2d 949 (1997). Because a motion to dismiss lies where there is no justiciable controversy, *see Broadwater v. State*, 303 Md. 461, 467, 494 A.2d 934 (1985), "[d]ismissal is proper only if the facts and allegations ... would ... fail to afford plaintiff relief if proven." *Faya v. Almaraz*, 329 Md. 435, 443, 620 A.2d 327 (1993).

## II.

### Scope of Employment

This case presents us with a question similar to that posed by former Chief Judge Gilbert in *Sawyer v. Humphries*, 82 Md.App. 72, 73, 570 A.2d 341 (1990), *rev'd on other grounds*, 322 Md. 247, 587 A.2d 467 (1991): "When is a police officer a police officer?" The answer to this question "is a more difficult question than whether ordinary employees are acting within the scope of their jobs, because officers usually are expected to perform police work 24 hours every day." Joyce Blalock, *Civil Liability of Law Enforcement Officers* 63 (1974).

In *Sawyer*, this Court was called upon to address whether an off-duty Maryland State Trooper was acting in the scope of his employment when he became involved in an altercation with another motorist, Robert Sawyer. Sawyer and the trooper passed one another on the roadway numerous times. The trooper was not pursuing Sawyer for any police matter, and had observed no infractions of the law by Sawyer. At one point, as Sawyer's vehicle passed the trooper, the trooper

hurled a rock at Sawyer's vehicle damaging the passenger side. Both parties stopped on the shoulder of the roadway, exited their vehicles, and engaged in a confrontation. At some point during the altercation, the motorist was able to enter his car at which point his passenger took control of the vehicle and fled the scene. The trooper, dressed in civilian clothing and driving his personal vehicle, returned to his vehicle and chased the motorist until they stopped at an intersection. The trooper arrested the driver and passenger and detained them until an on-duty trooper arrived. The civilians filed suit against the trooper, which was dismissed by the trial court. *See id.* at 75, 570 A.2d 341.

On appeal to this Court, we examined the trooper's employment by explaining:

> *'[T]he policeman in America is considered to be on duty twenty-four hours a day, seven days a week.* As a consequence, he is always on "good behavior." He cannot entirely give himself to his own interests and his own life. His friends always feel the shadow of the policeman's official position darkening their relationship. The officer's personal life is hedged with restrictions as to associations and activities. These limitations are designed to restrict him from corruption, compromising situations, or the appearance of either. *He is at the call of neighbors, more than other persons, much as the physician is.'*

*Id.* at 78, 570 A.2d 341 (quoting Justice Sydney H. Asch, *Police Authority and the Rights of the Individual* 35 (1968)) (emphasis added) (footnote omitted). We determined that a Maryland State Police employee, who is sworn as a peace officer, is "on duty twenty-four hours a day, seven days a week, fifty-two weeks a year." *Id.* at 83–84, 570 A.2d 341. Accordingly, we held that the trooper was acting in the scope of his employment. *See id.*

The Court of Appeals reversed. The Court scrutinized the scope of employment generally and enunciated that "[t]he general test ... for determining if an employee's tortious acts were within the scope of his employment is whether

they were in furtherance of the employer's business and were 'authorized' by the employer." *Sawyer v. Humphries*, 322 Md. 247, 255, 587 A.2d 467 (1991). The Court also explained:

'To be within the scope of the employment the conduct must be of the kind the servant is employed to perform and must occur during a period not unreasonably disconnected from the authorized period of employment in a locality not unreasonably distant from the authorized areas, and *actuated at least in part by a purpose to serve the master.*'

*Id.* (quoting *East Coast Freight Lines v. Mayor of Baltimore*, 190 Md. 256, 285, 58 A.2d 290 (1948) (emphasis added)). The Court also quoted with approval from the *Restatement of Agency*, as follows:

'[C]ertain conduct of the servant may be within the scope of his employment, although not intended or consciously authorized by the master, but "(1) To be within the scope of the employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized. (2) In determining whether or not the conduct, although not authorized, is nevertheless so similar to or incidental to the conduct authorized as to be within the scope of employment, the following matters of fact are to be considered:—(a) whether or not the act is one commonly done by such servants; (b) the time, place and purpose of the act; (c) the previous relations between the master and servant; (d) the extent to which the business of the master is apportioned between different servants; (e) whether the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant; (f) whether or not the master has reason to expect that such an act will be done; (g) the similarity in quality of the act done to the act authorized; (h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant; (i) the extent of departure from the normal method of accomplishing an authorized result, and (j) whether or not the act is seriously criminal." '

*Id.* at 256, 587 A.2d 467 (quoting *Restatement of Agency* § 229 (1933)).

Applying the above factors, the Court held that as a matter of law, the off-duty trooper was acting outside the scope of his employment when he became engaged in the altercation with the motorist beside the roadway. *See id.* at 257, 587 A.2d 467. The Court, however, did agree with our holding that the trooper was on duty twenty-four hours a day "in the sense that he may be on call and may under certain circumstances *have an obligation to act in a law enforcement capacity even when on his own time.*" *Id.* at 258, 587 A.2d 467 (emphasis added) (footnote omitted). The Court explained that "[e]ven though a police officer may be said to be 'on duty' all of the time, cases regularly hold that a police officer acts outside the scope of his employment where he acts for his own personal reasons and not in furtherance of his employer's law enforcement function." *Id.* at 259, 587 A.2d 467 (citations omitted).

■ With regard to the stop made by the trooper at the intersection, however, the Court of Appeals remanded the case so that further evidence may be gathered. The Court explained that

> the evidence at trial may show that, as a matter of law, the defendant ... was throughout acting in the scope of his employment and without malice. If it does, [the defendant] will be entitled to the immunity granted by the Maryland Tort Claims Act. On the other hand, the evidence may show that, as a matter of law, [the defendant] was either not acting in the scope of employment or was acting maliciously; in either event, he will not be entitled to immunity under the Tort Claims Act. Finally, the evidence may be such that a jury issue as to immunity, with regard to some or all counts, may be presented.

*Id.* at 262, 587 A.2d 467; *see also Artis v. Cyphers,* 100 Md.App. 633, 653, 642 A.2d 298, *aff'd,* 336 Md. 561, 649 A.2d 838 (1994) (holding that the issue of whether a defendant is a public official is a matter of law for the court to the extent the issue does not hinge on factual disputes). In essence, we glean from *Sawyer* that the determination of a police officer's capacity at the time of an event is a question to be answered

on a case-by-case basis and should be submitted to a fact finder *unless the capacity is clearly evident.*

Both Sterling and Sage rely on *Leach v. Penn–Mar Merchants Ass'n, Inc.,* 18 Md.App. 603, 308 A.2d 446 (1973). In *Leach,* an off-duty police officer working as a security guard at a shopping center assisted with a motor vehicle accident in the parking lot of the shopping center. The officer was summoned from the sidewalk of the shopping center by observers of the accident. The officer "responded by leaving the sidewalk, crossing the fire lane, and approaching the damaged vehicles." *Id.* at 605, 308 A.2d 446. An on-duty officer was called to the scene and the off-duty officer retrieved a police report form and "subpoena" from the police vehicle and proceeded to write a report. During his preparation of the report, the off-duty officer placed one of the vehicle owners under arrest for obstructing justice. The arrested motorist sued the shopping center owner. In determining that the shopping center was not liable, we held that the officer was not an agent of the center at the time of the incident. *See id.* at 608, 308 A.2d 446. We explained that the officer stepped from his role as a security guard into his role as a police officer by virtue of the duties undertaken by him. The officer issued a citation and a summons, duties that are not authorized to be undertaken by a citizen security guard. The actions were no longer in furtherance of the shopping center, the shopping center no longer had jurisdiction over him, and it was not responsible for his actions performed solely as a police officer. *See id.* at 611, 308 A.2d 446.

While *Leach* is helpful to show that an off-duty police officer working as a security guard may change roles and become a police officer when called upon to do so, we do not find it dispositive on the issue of whether Anderson acted as a police officer when he shot at Terry and Jennings and inadvertently injured Lovelace. We distinguish *Leach* from the instant case because in *Leach,* the officer acted purely for the benefit of protecting the public peace by asserting powers that a security guard does not have. In the present case, Anderson did not leave the establishment and undertake actions unrelated

to his role as a security guard. He was hired to secure the premises of the hotel from crime, and preventing an armed robbery falls within his role as a security guard.

The Court of Appeals addressed the capacity of an off-duty police officer in *Lodowski v. State,* 302 Md. 691, 490 A.2d 1228 (1985), *vacated on other grounds,* 475 U.S. 1078, 106 S.Ct. 1452, 89 L.Ed.2d 711 (1986). There, the Court analyzed, in a criminal law context, whether a defendant was properly sentenced to death for the murder of an off-duty police officer working as a security guard. The propriety of the death sentence hinged upon whether the officer was killed while in the performance of his duties as a law enforcement officer. The Court held that the officer was not acting as a police officer because the illegal conduct leading up to his death was not recognized by the officer. *Id.* at 729–33, 490 A.2d 1228. The Court concluded: ·

> The test with respect to whether [the victim] was in the performance of his duties as a police officer when he was murdered is not whether [the defendants] knew that [the victim] was a police officer, but whether [the victim] knew that an act had occurred or was occurring which obliged him to take proper police action.

*Id.* at 733, 490 A.2d 1228. The Court in *Lodowski* concluded that the issue was unclear and that there was insufficient evidence to show that the victim was murdered while in the performance of his duties. *See id.* The officer was shot in the back of his head through the rear window of his police cruiser and there was no evidence that any criminal matter requiring police action ever came to his attention before this fatal shot. *See id.* at 732, 490 A.2d 1228. The Court held that

> [s]ince the evidence was not sufficient to establish beyond a reasonable doubt that the crimes had come to his attention before he was killed, it follows that [the victim] *had not reverted from his status as a private security guard to the status of a law enforcement officer* so as to take any action in the performance of his duties.

*Id.* (Emphasis added). The Court remanded the case to the trier of fact to make the determination of whether the officer knew of criminal activity requiring police action at the time of his death. *See id.* at 734, 490 A.2d 1228.

We find several out of state cases persuasive in determining the role of an off-duty police officer working as a private security guard. In *Whitely v. Food Giant, Inc.*, 721 So.2d 207 (Ala.Civ.App.1998), the Court of Civil Appeals of Alabama held that an off-duty police officer employed by Food Giant as a security guard was acting in his sole capacity as a police officer when he intervened in an altercation between two customers. *See id.* at 209. In the midst of a verbal altercation, one customer proceeded in the other's direction with a balled fist. The officer intervened and the court held that "when an off-duty police officer witnesses an offense for which the perpetrator is arrested, the officer's status changes, and he is then acting in his capacity as a police officer and not his capacity as a security guard." *Id.* The court measured this change "at the time he witness[ed] the offense." *Id.*

In *Bauldock v. Davco Food, Inc.*, 622 A.2d 28 (D.C.1993), the District of Columbia Court of Appeals analyzed the capacity of an off-duty police officer working as a security guard in a fast food restaurant. *See id.* at 32–34. There, the court determined that the ejection and subsequent arrest of a disorderly patron properly fell within the police powers granted to the officer by virtue of his employment with the police department. *See id.* at 34. The court held as a matter of law that even though the officer's actions may have benefitted the restaurant, they were taken pursuant to his role as a police officer, not as an agent or employee of the private employer. *See id.*

A guard was also acting in his capacity as a police officer in *Tapp v. State*, 406 N.E.2d 296 (Ind.Ct.App.1980) where the Court of Appeals of Indiana analyzed the role of an off-duty police officer working as a security guard in plain clothes at a Sears department store. *See id.* at 297. While working at the store, the guard observed a person conceal an item and

attempt to leave the store without purchasing the item. *See id.* He approached the suspect and a scuffle ensued; the guard was bitten three times by the suspect, and the suspect was eventually arrested. *See id.* The court determined that the guard was acting solely as an officer of the law at the time of incident. *See id.* at 302. In reaching its conclusion, the court expounded:

'A duly commissioned police officer holds a public office upon a continuing basis. The officer here remained an officer of the law, and his obligation to preserve the peace was not nullified by the fact he was working for [a private employer] in this case. Notwithstanding, the officer, even though acting as a private security policeman, had the right and duty to arrest and detain a person who was violating a law of this state....'

*Id.* at 301 (quoting *State v. Glover,* 52 Ohio App.2d 35, 367 N.E.2d 1202, 1204 (Ohio Ct.App.1979)). The court further explained that "an officer's duties are not constrained by specific time or place limitations. It is the nature of the acts performed by the officer which determine whether the officer was in the execution of his official duties." *Id.*

In the present case, it is undisputed that Anderson was employed by the BCPD at the time of the shooting, although he was off duty at the time. This does not, however, affect his status as a police officer. In fact, the rules and regulations of BCPD state otherwise:

Members of the department are sworn in as peace officers of Baltimore City and, as such, are considered to be on-duty or ready for duty at all times.

Failure to stop and perform the necessary police duty while off-duty or on leave shall be considered neglect of duty. *Necessary police duty, while off-duty may include, but is not necessarily limited to, immediately notifying the responsible law enforcement agency or causing such notification, or taking direct police action.* Off-duty members, both inside and outside of the City limits, are to give first consideration to causing the appropriate action to be effect-

ed by the on-duty members of the responsible law enforce-
ment agency. Members should become directly involved
only after due consideration of the gravity of the situation,
their present physical and mental ability to act in an on-
duty capacity and of their possible liability, along with that
of the department and the City of Baltimore. Members are
reminded that they have no powers of arrest outside the
City of Baltimore or properties owned by the City of
Baltimore, other than those of citizens. Whenever mem-
bers assume their official role and take direct police action,
they are governed by all policies, rules and regulations
applicable to on-duty members.

Rule 1, Section 23 of Annex A (Rules and Regulations) to
Baltimore City Police Department General Order 2–88 (June
24, 1988) (emphasis added). In addition, pursuant to written
police policy, "secondary employment does not excuse [a police
officer] from [the officer's] duty to stop and take action while
off-duty. . . ." Rule 13, Baltimore City Police Department
General Order 6–90 (April 30, 1990).

The General Assembly enacted legislation which is instruc-
tive on the public policy behind granting immunity to an
officer. Section 5–309.2 of the Courts and Judicial Proceed-
ings Article protects a law enforcement officer from civil
liability when acting outside of the officer's jurisdiction. *See*
Md.Code (1974, 1989 Repl.Vol.), § 5–309.2 of the Courts &
Judicial Proceedings Article.[5] The statute provides:

 (a) *When not civilly liable.*—A law-enforcement officer act-
ing outside the officer's jurisdiction but in the State, is not
civilly liable, except to the extent that he would be if acting
in his own jurisdiction, for any act or omission in preventing
or attempting to prevent a crime, or in effectuating an
arrest, in order to protect life or property if:

 (1) The action is not grossly negligent; and

---

**5.** This section has been transferred to Md.Code (1974, 1998 Repl.Vol.),
§ 5–605 of the Courts & Judicial Proceedings Article.

(2) The action is taken at the scene of the crime or attempted crime.

(b) *Defense by employer.*—A law-enforcement officer sued for acting under subsection (a) of this section shall be defended in any civil action by the law-enforcement officer's employer as if the incident had occurred in the officer's jurisdiction.

*Id.* The enactment of this provision evidences the General Assembly's intent that prevention of crime and protection of the sovereign by an off-duty police officer is paramount to any injuries that may result from the officer's action, unless grossly negligent.

■ Anderson, although off duty and outside of his jurisdiction, was still authorized and required to uphold the laws of the State of Maryland. When confronted with two armed robbers at the hotel, clearly a felony in progress endangering himself and others, Anderson reverted to his police officer status. While the intervention by Anderson in this felony may have secondarily advanced the interests of the hotel owner and management company, the primary service by Anderson related to his law enforcement function of protecting the public from the armed felons. As the armed robbery unfolded, Anderson was undeniably faced with circumstances that are within the scope of employment as a police officer. The existence of his secondary employment did not abrogate the execution of his duties as a law enforcement officer. Accordingly, we conclude that the trial court was correct in determining as a matter of law that Anderson was acting in his role as a police officer when he intervened in the felony.

## III.

### Immunity

■ A cause of action against a police officer grounded in negligence often results in the officer asserting a defense of qualified immunity. *See, e.g., Parker v. State,* 337 Md. 271, 285, 653 A.2d 436 (1995). The purpose of granting an official immunity is to limit the deleterious effects that the risks of

civil liability would otherwise have on the operations of government. *See Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). The Fourth Circuit Court of Appeals has stated:

> Discretionary decisions by government actors inevitably impact the lives of private individuals, sometimes with harmful effects. Moreover, such decisions are inescapably imperfect. Especially in the context of police work, decisions must be made in an atmosphere of great uncertainty. Holding police officers liable in hindsight for every injurious consequence of their actions would paralyze the functions of law enforcement.

*Pinder v. Johnson,* 54 F.3d 1169, 1173 (4th Cir.1995). Conferring a qualified immunity upon a law enforcement officer allows the officer "the freedom to exercise fair judgment, protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986)). "Moreover, permitting unwarranted lawsuits against officers would entail substantial social costs including inhibition and fear of potential liability among peace officers and would further consume much of the officer's time preventing him or her from performing his or her duties." *Williams v. Prince George's County,* 112 Md.App. 526, 543, 685 A.2d 884 (1996). Thus, the goal of official immunity is to halt most civil liability actions, except those in which the official is *clearly* in violation of the law, well in advance of the submission of facts to a fact finder. *See Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985) (emphasis added).

As explained in *Civil Liability of Law Enforcement Officers, supra,* at 167:

> Civil liability of officers poses a dilemma to policemen, to complainants and to the community. The latter requires officers who are undaunted and who will respond promptly to incidents. Fear of judgments for misconduct could induce excessive caution and impede aggressive enforcement. . . . [T]he future of an officer, and that of his family, should not be in jeopardy when he performs public services.

As a result, officers who act reasonably without the benefit of hindsight, albeit mistakenly, are granted immunity. *See id.*

In Maryland, the immunity for an officer was delineated by Judge Digges for the Court of Appeals in *James v. Prince George's County,* 288 Md. 315, 418 A.2d 1173 (1980), *superceded by rule on other grounds, Prince George's County v. Fitzhugh,* 308 Md. 384, 519 A.2d 1285 (1987), as follows:

Before a governmental representative in this State is relieved of liability for his negligent acts, it must be determined that the following independent factors *simultaneously* exist: (1) the individual actor, whose alleged negligent conduct is at issue, is a *public official* rather than a mere *government employee or agent;* and (2) his tortious conduct occurred while he was performing *discretionary,* as opposed to *ministerial,* acts in furtherance of his official duties.

*Id.* at 323–24, 418 A.2d 1173 (emphasis in original) (footnote omitted). Once the two factors are established, "a qualified immunity attaches; namely, in the absence of malice, the individual involved is free from liability." *Clea v. Mayor of Baltimore,* 312 Md. 662, 673, 541 A.2d 1303 (1988).

The *James* Court enunciated four guidelines to determine whether a public employee is entitled to a qualified public official immunity. This Court reiterated those guidelines, and stated that we must examine

whether the position was created by law and involves continuing and not occasional duties; whether the holder performs an important public duty; whether the position calls for the exercise of some portion of the sovereign power of the State; and whether the position has a defined term for which a commission is issued and a bond and an oath are required.

*Artis,* 100 Md.App. at 638, 642 A.2d 298 (citing *James,* 288 Md. at 324, 418 A.2d 1173).

The *James* Court also set forth the standard for determining whether the action of an official is discretionary, as opposed to ministerial. The Court explained: "[A]n act falls within the discretionary function of a public official if the

decision which involves an exercise of his personal judgment also includes, to more than a minor degree, the manner in which the police power of the State should be utilized." *James*, 288 Md. at 327, 418 A.2d 1173.

Unquestionably, a law enforcement officer is not a mere government employee; rather, the officer, under oath, holds a continuing public duty which calls for the exercise of some portion of the sovereign power of the State. Additionally, an officer who acts within the scope of employment is performing a discretionary act. *See Robinson v. Board of County Comm'rs*, 262 Md. 342, 347, 278 A.2d 71 (1971). Thus, a law enforcement officer is entitled to qualified public official immunity. That immunity for Maryland police officers, as well as other public officials, is codified at Md.Code (1974, 1998 Repl.Vol.), § 5–511(b) of the Courts & Judicial Proceedings Article. This section provides:

> *Immunity generally.*— . . . an official of a governmental entity, while acting in a discretionary capacity, without malice and within the scope of the official's authority is immune as an official or individual from civil liability for any act or omission.

Law enforcement officers acting outside of their jurisdiction are also entitled to a qualified immunity, under Md.Code (1974, 1998 Repl.Vol.), § 5–605(a)(1) of the Courts & Judicial Proceedings Article (formerly codified at Md.Code (1974, 1989 Repl.Vol.), § 5–309.2(a)(1) of the Courts & Judicial Proceedings Article). That section provides, in pertinent part, that such an officer "is not civilly liable, except to the extent that he would be if acting in his own jurisdiction . . ." if the officer took action "at the scene of the crime or attempted crime," and the actions were "not grossly negligent." *Id.* Thus, to determine Anderson's liability in this case, we must examine his potential liability *both* inside of his jurisdiction and outside of his jurisdiction.

With respect to conduct within an officer's jurisdiction, the qualified public official immunity statute confers immunity if there is no malice on the part of Anderson and he is acting

within the scope of his authority. *See id.* § 5–511(b). We have previously explained that Anderson was acting within the scope of his employment as a police officer. Therefore, we must examine whether he acted with malice.

With respect to Anderson's conduct outside of his jurisdiction, we must examine whether his actions were grossly negligent.[6] *See id.* § 5–605.

### a.

### Malice

### (Acting Within Jurisdiction)

■ As we have said, a public official will be barred from asserting the defense of qualified public official immunity when the official's actions are effectuated with malice. *See id.* § 5–511(b). "[D]isposition by summary judgment is generally inappropriate in cases involving motive or intent." *Clea,* 312 Md. at 677, 541 A.2d 1303 (quoting *DiGrazia v. County Exec. for Montgomery County,* 288 Md. 437, 445, 418 A.2d 1191 (1980)). In addition, where "facts are susceptible to inferences supporting the position of the party opposing summary judgment, then a grant of summary judgment is improper. Those inferences, however, must be *reasonable* ones," and where not reasonable, the entry of summary judgment is appropriate. *Id.* at 677–78, 541 A.2d 1303 (emphasis in original) (citations omitted).

■ Statutory public official immunity has an important operative effect on Maryland constitutional and non-constitutional claims against sworn law enforcement officers of a municipal corporation's police department. It assigns to the plaintiff the burden of pleading—and proving—that the defendant-officer acted with 'malice.' . . . In claims based on Maryland law, malice is established by proof that the defendant-officer 'intentionally performed an

---

6. Section 5–605 also requires that the law enforcement officer take action "at the scene of the crime or attempted crime." It is undisputed that Anderson took action at the scene of the crime.

act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff.'

*Davis v. DiPino*, 99 Md.App. 282, 290–91, 637 A.2d 475 (1994), *rev'd on other grounds*, 337 Md. 642, 655 A.2d 401 (1995) (quoting *Leese v. Baltimore County*, 64 Md.App. 442, 480, 497 A.2d 159 (1985)). We do not find a scintilla of evidence in the record that Anderson harbored ill will or an evil motive. Accordingly, we hold that appellant failed to meet his burden of proving malice.

### b.

### Gross Negligence

### (Acting Outside Jurisdiction)

 The defense of immunity is foreclosed for police officers acting *outside* of their jurisdiction when their actions are grossly negligent. *See* Md.Code (1974, 1998 Repl.Vol.), § 5–605(a)(1) of the Courts & Judicial Proceedings Article. In determining whether there was evidence of gross negligence by Anderson, our principal thrust must be to determine the reasonableness of Anderson's actions. *See Williams*, 112 Md. App. at 541–42, 685 A.2d 884. We explain.

 "Gross negligence must be plead with specificity." *Khawaja v. Mayor of Rockville*, 89 Md.App. 314, 318, 598 A.2d 489 (1991). "In determining whether a defendant's actions constituted gross negligence, we must ask whether the accused's conduct, 'under the circumstances, amounted to a disregard of the consequences which might ensue and indifference to the rights of others, and so was a wanton and reckless disregard for human life.'" *State v. Albrecht*, 336 Md. 475, 500, 649 A.2d 336 (1994) (quoting *Duren v. State*, 203 Md. 584, 590, 102 A.2d 277 (1954)). The Court of Appeals in *Albrecht*, in discussing gross negligence, further stated:

[T]he accused must have committed 'acts so heedless and incautious as necessarily to be deemed unlawful and wanton,' manifesting such a gross departure from what would

be the conduct of an ordinarily careful and prudent person under the same circumstances so as to furnish evidence of an indifference to consequences.

*Id.* (quoting *United Life & Accident Ins. Co. v. Prostic,* 169 Md. 535, 539, 182 A. 421 (1936)) (citations omitted). To determine whether Anderson's actions were grossly negligent, the standard against which his actions are assessed is "typically the conduct of an ordinary prudent citizen similarly situated." *Id.* at 501, 649 A.2d 336. As we explained in *Albrecht v. State,* 97 Md.App. 630, 642, 632 A.2d 163 (1993), *rev'd on other grounds,* 336 Md. 475, 649 A.2d 336 (1994), the standard for a police officer differs from that of a citizen. We stated:

Under almost all circumstances, the gratuitous pointing of a deadly weapon at one civilian by another civilian would almost certainly be negligence *per se,* if not gross negligence *per se.* A police officer, on the other hand, is authorized and, indeed, frequently obligated to threaten deadly force on a regular basis. The standard of conduct demanded of a police officer on duty, therefore, is the standard of a reasonable police officer similarly situated.

*Id.* at 642, 632 A.2d 163; *see also Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989).

The standard for the reasonableness of force effectuated by a police officer in making an arrest was adopted by this Court in *Wilson v. State,* 87 Md.App. 512, 590 A.2d 562, *cert. denied,* 324 Md. 325, 597 A.2d 422 (1991):

The reasonableness of the force used must be judged in the light of the circumstances as they appeared to the officer at the time he acted, and the measure is generally considered to be that which an ordinarily prudent and intelligent person, with the knowledge and in the situation of the arresting officer, would have deemed necessary under the circumstances.

*Id.* at 521, 590 A.2d 562 (quoting 5 Am.Jur.2d *Arrest* § 81) (footnotes omitted). In other words, a court should consider only those facts and circumstances known to the officer at the time of his or her action. *See Rodriguez v. City of Passaic,*

730 F.Supp. 1314, 1322 (D.N.J.), *aff'd,* 914 F.2d 244 (3d Cir.1990). Generally, the use of deadly force by a police officer is reasonable under the following circumstance:

> Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if . . . there is probable cause to believe that [the suspect] committed [or is committing] a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Tennessee v. Garner,* 471 U.S. 1, 11–12, 105 S.Ct. 1694, 1701, 85 L.Ed.2d 1 (1985).

In the present case, appellant argues that at least one inference of gross negligence can be made from the facts. He recites the alleged inferences as follows:

1. Anderson was reckless when he announced that he was the "police" and startled the robbers.

2. In the alternative, Anderson was reckless because he failed to identify himself as the "police"—and if he had done so [he] could have prevented a shootout.

3. Anderson was reckless when he discharged his weapon first and therefore initiated a shootout.

4. Anderson was reckless because he should not have fired first, but instead should have waited and called back-up.

5. Anderson was reckless and should have stopped the robbers when he initially saw them walk in stiff-armed.

6. Anderson was reckless because he should not have fired his service revolver for which he did not have a permit.

7. Anderson was reckless in aiming directly at Lovelace.

8. Anderson was reckless in shooting 12 bullets in a lobby of a hotel.

9. Anderson was reckless in shooting with "tunnel vision" i.e. a narrow outlook; specif., [sic] the focus of atten-

tion on a particular problem without proper regard to possible consequences or alternative approaches.

10. In the alternative, Anderson was reckless in "trying to hit anybody" while he was shooting.

11. Anderson was reckless by shooting at Earl Jennings on the floor when he was in such close proximity to Mr. Lovelace (a foot away).

12. Anderson acted without due regard to the danger caused to an innocent third person, i.e. Lovelace.

13. Anderson should have realized that his actions created an unreasonable risk of causing such harm to a bystander, Lovelace.

Again, all of these allegations can be addressed by analyzing the reasonableness of Anderson's actions.

We begin by reviewing the scene of the crime captured by the two security cameras in the hotel.[7] The videotape enables one reviewing the events to understand more clearly what position Anderson was in when the situation presented itself. It shows how quickly the events unfolded and exemplifies why

---

7. *See Walker v. State*, 125 Md.App. 48, 57, 723 A.2d 922 (1999) (using a videotape to "scrutinize, analyze, and repeatedly review" what occurred in a courtroom fracas); *In re Adoption/Guardianship No. 3598*, 109 Md.App. 475, 516, 675 A.2d 170 (1996), *rev'd on other grounds*, 347 Md. 295, 701 A.2d 110 (1997) (finding no support for trial court's conclusion based on appellate review of a videotape); *Suggs v. State*, 87 Md.App. 250, 257 n. 2, 589 A.2d 551 (1991) (reviewing a videotape to examine a trial judge's conduct); *see also Baptiste v. J.C. Penney Co., Inc.*, 147 F.3d 1252, 1257 (10th Cir.1998) (utilizing a videotape to support a trial court's factual finding of a lack of probable cause, thereby affirming a denial of a motion for summary judgment based upon qualified immunity of a police officer); *Williams v. Sing Bros.*, 226 Ga.App. 657, 487 S.E.2d 445, 446 (1997) (concluding that "[n]otwithstanding [appellant's] claim to the contrary, the videotape indisputably shows" that appellant is not entitled to recover, and as such, the trial court's granting of summary judgment was proper); *Thompson v. Wal–Mart Stores, Inc.*, 890 S.W.2d 780, 781–83 (Mo.Ct.App.1995) (explaining that a review of a surveillance videotape provides sufficient probable cause to affirm a granting of a motion for summary judgment); *Mangum v. Golden Gallon Corp.*, 1999 WL 114221, at *5 (Tenn.App.1999) (holding that after a review of a surveillance videotape, there are no facts in dispute that would foreclose the entry of summary judgment).

courts have enunciated the rule that we must not use "the $^{20}/_{20}$ vision of hindsight" in reviewing the reasonableness of an officer's conduct at the scene of the crime. *Graham*, 490 U.S. at 396, 109 S.Ct. at 1872. The videotape clearly depicts the positions of each party just prior to the shooting which we have set forth below:

Jennings was holding a shotgun pointed directly at Gordon. Anderson was approximately ten to fifteen feet behind the suspects, sitting on a sofa behind a coffee table. In his attempt to prevent a felony under the threat of imminent deadly force, Anderson entered into a gun battle with the suspects. Terry, Jennings, and Lovelace all fell to the floor. Lovelace testified that he was uninjured at that time. Terry got up and fled the lobby out the front door. Lovelace was on the ground near the right side of the front desk in between the front desk and door. As Terry fled, he crossed in front of Lovelace, between Lovelace and Anderson. At some point during the melee, Lovelace was inadvertently struck in the foot by a ricocheting bullet. Anderson then proceeded to inflict the fatal shot to Jennings, thereby ending the gun battle.

██ "Police are presented each day with unanticipated dangers; they are often called to respond quickly and instinctively to situations that may require the use of deadly force. They are permitted to carry firearms whether on duty or off, and are vested with individualized discretion in the use of those firearms." *City of Annapolis v. United Food and Commercial Workers, Local 400,* 317 Md. 544, 562, 565 A.2d 672 (1989). Appellant asserts that a dispute of fact exists with regard to whether Anderson announced his presence as an officer. As we stated earlier, the Supreme Court clarified that a warning should only be given "where feasible." *Garner,* 471 U.S. at 11–12, 105 S.Ct. at 1701. A warning is considered feasible when it is "capable of being performed without prolonging or compounding the threat presented by a suspect." *Maravilla v. United States,* 867 F.Supp. 1363, 1378 (N.D.Ind. 1994), *aff'd,* 60 F.3d 1230 (7th Cir.1995). The Court of Appeals for the Eighth Circuit has concluded that where an officer is faced with urgent circumstances, failure to give a warning prior to the use of deadly force does not render the use of deadly force unreasonable. *See Krueger v. Fuhr,* 991 F.2d 435, 440 (8th Cir.1993), *cert. denied,* 510 U.S. 946, 114 S.Ct. 386, 126 L.Ed.2d 335 (1993). The United States District Court in *Ridgeway v. City of Woolwich Township Police Dept.,* 924 F.Supp. 653 (D.N.J.1996), summarized the potential adverse consequence of a warning as follows:

> In the cool aftermath, it is deceptively easy to say: 'What harm can come from giving a warning?' In the split-second reality of a deadly police [encounter], that warning (whether verbal or a shot in the air) might permit the suspect to turn and fire a weapon or otherwise facilitate his escape, putting at risk innocent police and civilians who[m] he encounters in [his] path. . . .

*Id.* at 659. Anderson was out-numbered by the suspects and knew that at least one was armed with a shotgun. It was reasonable for Anderson to conclude that if he gave a warning, the suspects may have turned and fired upon him, thereby increasing the risk to himself and others. Accordingly, the

dispute of facts concerning whether Anderson gave a warning is not material.

Appellant also argues that Anderson's failure to apply for a handgun permit from the Maryland State Police amounted to gross negligence. On this issue, we find instructive the opinion of the United States Court of Appeals for the Fourth Circuit in *Greenidge v. Ruffin,* 927 F.2d 789 (4th Cir.1991). There, the court analyzed whether evidence regarding an officer's violation of "standard police procedure for night time prostitution arrests" was properly excluded from trial. The appellants in that case argued that the violation of police procedure was probative on the issue of the officer's reasonableness. In affirming the trial court's exclusion of the alleged violation, the Fourth Circuit held the alleged violation of police procedure "not relevant" and reasoned:

> (1) The 'reasonableness' of an officer's particular use of force 'must be judged from the perspective of a reasonable officer on the scene, rather than with the $^{20}/_{20}$ vision of hindsight'; (2) 'reasonableness' means 'the standard of reasonableness at the moment' and (3) 'split-second judgments' are required to be made.

*Id.* at 791–92. In doing so, the court reiterated that the reasonableness is to be determined "exclusively upon an examination and weighing of the information [the officer] possessed immediately prior to and at the very moment [the officer] fired the ... shot[s]." *Id.* at 792; *see also Drewitt v. Pratt,* 999 F.2d 774 (4th Cir.1993) (holding that alleged failure to display badge prior to shooting was immaterial in assessing whether at the moment of the shooting, the officer was reasonable in using deadly force). *Rowland v. Perry,* 41 F.3d 167 (4th Cir.1994) is also instructive on the point:

> Though it focuses on the objective facts, the immunity inquiry must be filtered through the lens of the officer's perceptions at the time of the incident in question.... Such a perspective serves two purposes. First, using the officer's perception of the facts at the time limits second-guessing the reasonableness of actions with the benefit of

$^{20}/_{20}$ hindsight. Second, using this perspective limits the need for decision-making to sort through conflicting versions of the 'actual' facts, and allows them to focus instead on what the police officer reasonably perceived.

*Id.* at 173 (citations omitted). The failure of appellant to obtain a handgun permit for secondary employment may constitute an internal BCPD regulation violation, but it is not material to the reasonableness of Anderson's actions. There is no causal relationship between his failure to obtain the permit and the reasonableness of his actions when confronted with the situation. There is no reason to think Anderson would have reacted differently to the situation presented if he *had* obtained the permit. Accordingly, we find that Anderson's failure to obtain a permit for carrying a weapon during his secondary employment does not impact upon the reasonableness of his actions in the present case.

Appellant next argues that Anderson was grossly negligent in failing to call for backup, failing to stop the suspects upon entry, and failing to allow the suspects to exit before apprehending them. These arguments also fail for reasons similar to those stated above. The Fourth Circuit has held that a police officer cannot be found liable when it is alleged that the officer created a dangerous situation. *See Greenidge*, 927 F.2d at 791. "The officer[']s actions leading up to the time immediately prior to the shooting are neither relevant [n]or admissible." *Id.* at 792. Once again, the only inquiry of reasonableness is whether Anderson acted reasonably in firing at the suspects "based on his perceptions immediately prior to and at the very moment he fired the ... shot[s]." *Id.*

In *Slattery v. Rizzo*, 939 F.2d 213 (4th Cir.1991), a leading Fourth Circuit qualified immunity case, police were conducting a sting operation in a parking lot frequented by drug users and dealers. Slattery was seated on the passenger side of an automobile. A police officer approached the vehicle and ordered Slattery to raise his hands. The officer could see an object in the hand of Slattery. When Slattery, in violation of

the officer's order, moved towards the officer, the officer shot Slattery in the face. The object in Slattery's hand turned out to be a beer bottle. The Fourth Circuit, nevertheless, held that the officer was *entitled to summary judgment based on qualified immunity. See id.* at 216. It based its holding on a decision of the Supreme Court which limited a police officer's force to those instances in which the officer has probable cause to believe that a suspect poses a threat of serious bodily harm to the officer or others. *See Garner,* 471 U.S. at 11, 105 S.Ct. at 1701. In granting the officer summary judgment based on immunity, the Fourth Circuit determined that under the undisputed facts of the case, the officer acted reasonably in using deadly force when he believed that Slattery posed a deadly threat to him. *See Slattery,* 939 F.2d at 216–17.

With regard to appellant's contention that Anderson should have allowed the suspects an opportunity to exit prior to attempting to apprehend them, the Fourth Circuit recently stated:

> The Fourth Amendment does not require police officers to wait until a suspect shoots to confirm that a serious threat of harm exists. . . . No citizen can fairly expect to draw a gun [in the presence of] police without risking tragic consequences. And no court can expect any human being to remain passive in the face of an active threat on his or her life. As *Greenidge* and *Slattery* illustrate, the Fourth Amendment does not require omniscience. Before employing deadly force, police must have sound reason to believe that the suspect poses a serious threat to their safety or the safety of others. Officers need not be absolutely sure, however, of the nature of the threat or the suspect's intent to cause them harm—the Constitution does not require that certitude precede the act of self protection.

*Elliott v. Leavitt,* 99 F.3d 640, 643–44 (1996), *cert. denied,* 521 U.S. 1120, 117 S.Ct. 2512, 138 L.Ed.2d 1015 (1997). Thus, Anderson was entitled to take action to protect his life and the life of Lovelace and Gordon without having concrete evidence of the suspects' intentions to cause serious or deadly harm. His reasonable perceptions were sufficient.

It is undisputed that appellant was not in the first line of fire when Anderson took police action. BCPD General Order 2–88, Rule 3, Section 1 provides, in pertinent part:

Sworn members when off-duty, outside the jurisdiction of the City of Baltimore, within the State of Maryland, are authorized to carry an issued or approved handgun.... Members of this department shall not use firearms in the discharge of their duty, except in the following cases:

a. In self-defense, or to defend another person (unlawfully attacked) from death or serious injury;

b. To effect the arrest or to prevent the escape, when other means are insufficient, of a person whom the officer has probable cause to believe:

—Has committed a felony involving the use or threat of deadly force or serious physical injury; *and*

—Who poses an *imminent* threat of death or serious physical injury to the officer or others.

*NOTE:* Where feasible, the officer should give verbal warning prior to shooting at the felon. There are, however, situations where the issuance of a warning would be detrimental to the safety of the officer or others. In such a case, an officer need not give warning if to do so would increase the risk to himself or others.

Rule 3, Section 1 of Rules and Regulations.

A reasonable police officer would have probable cause to believe,[8] based upon the undisputed facts of this case, that the two armed men, Terry and Jennings, posed a deadly threat to Gordon, Lovelace, and himself in the process of robbing Gordon. Accordingly, he would be authorized to use deadly force. There are no reasonable inferences that would allow a fact finder to conclude that Anderson did not act as a reasonable police officer would at the time the events were occurring. At the time of the shooting, Anderson was presented with a

---

8. When there are sufficient facts supporting probable cause that are undisputed, probable cause may be decided as a matter of law. *See W.T. Grant Co. v. Guercio,* 249 Md. 181, 187, 238 A.2d 855 (1968).

situation in which two suspects were: 1) committing a felony involving the threat of deadly force; 2) armed with deadly weapons; and 3) likely to pose danger of serious harm or death to others if not immediately apprehended. It was objectively reasonable for Anderson "to make a split-second determination in the heat of the moment that deadly force was necessary to stop" the two robbers. *Ridgeway,* 924 F.Supp. at 658. He acted to protect two civilians and himself from not only serious injury, but fatal injury. We find the old adage that an ounce of prevention is worth a pound of cure to be applicable in this instance. Viewing the allegations in the light most favorable to the appellant, we hold as a matter of law that Anderson did not act with gross negligence.

## IV.

### Sterling and Sage

Appellant contends that the lower court erred in entering summary judgment in favor of Sterling and Sage and claims that they are vicariously liable for Anderson's alleged negligence under the principle of respondeat superior. It is patent that in order for Sage and Sterling to be vicariously liable for Anderson's actions, Anderson must be found to be the agent of Sage and/or Sterling at the time of the incident. *See Leach,* 18 Md.App. at 608, 308 A.2d 446. In other words, in order for liability to attach to either Sage or Sterling under respondeat superior, Anderson must have been working in the scope of employment for either of those employers. *See Oaks v. Connors,* 339 Md. 24, 30, 660 A.2d 423 (1995).

The relationship between an off-duty police officer and a private employer of an officer was described by the District of Columbia Court of Appeals in *Bauldock:*

[T]here can be no doubt at all [that] if he had been an officer regularly employed by the [Department] authorities, and had simply been detailed for service at the [location], the company would not have been in the slightest degree responsible for any abuse of his authority as such officer. The only thing that is apt to leave some confusion in our

minds is this dual employment by him, in the character of agent of the company and agent of the public. . . . [T]here is no doubt he can perform some duties in one character that he cannot in the other.

*Bauldock,* 622 A.2d at 33 (quoting *Wells v. Washington Mkt. Co.,* 19 D.C. 385, 393 (1890)). In holding that the employer was not liable for the officer's actions, the court explained:

[T]he officer perhaps had more inclination to show super-servicable zeal in behalf of the interests of the [employer] company. Nevertheless, his appointment under these circumstances did not change, in the slightest degree, his duties and his responsibility as an officer of the . . . [p]olice force, and we consider this arrest to have been made in virtue of that authority, and not as the agent of [the] company, and they ought not to be held responsible.

*Id.* at 33–34 (quoting *Wells,* 19 D.C. at 398).

We earlier concluded that Anderson was acting as a police officer at the time of the shooting. All of the acts alleged by appellant to be negligent occurred after Anderson's status changed to that of a police officer. Accordingly, we find that Anderson was not the agent of either Sage or Sterling; thus, neither is liable under the doctrine of respondeat superior. *See e.g., Whitely,* 721 So.2d at 209 (holding that employer is not liable for acts occurring after private guard's status changes to police officer); *Lande v. Menage Ltd. Partnership,* 702 A.2d 1259, 1261 (D.C.1997) (holding that a private entity which employs an off-duty police officer is not liable for actions of the officer in carrying out his law enforcement duties).

### V.

### State of Maryland, BCPD, MCCB, and Frazier

We next address appellant's attempt to hold the State of Maryland and MCCB vicariously liable for Anderson's alleged tortious conduct. Appellant requested a one million dollar damage award against the State of Maryland because he alleged "at all times . . . Anderson, was acting as the agent,

servant and/or employee of the Defendant, State of Maryland." He made a similar request with regard to MCCB. The trial court dismissed appellant's claim against the State and MCCB without specifying a reason. Nevertheless, when a trial court fails to state a reason for granting a motion to dismiss, we may affirm the trial court if the record supports a conclusion that is legally correct. *See Briscoe v. Mayor of Baltimore,* 100 Md.App. 124, 128, 640 A.2d 226 (1994).

 It is well settled that an employer may be held vicariously liable under the doctrine of respondeat superior for tortious acts committed by an employee, so long as those acts are within the scope of employment. *See Oaks,* 339 Md. at 30, 660 A.2d 423. Anderson's employers cannot be held vicariously liable, however, when we hold Anderson is not liable. The Court in *Bradshaw v. Prince George's County,* 284 Md. 294, 396 A.2d 255 (1979), *overruled on other grounds, Cox v. Prince George's County,* 296 Md. 162, 460 A.2d 1038 (1983), explained:

> To the extent that a [government] is liable in tort actions, it is also responsible under the doctrine of *respondeat superior* for the tortious conduct of its employees which occurs in the scope of their employment. However, the nature of a [government's] liability under this doctrine is derivative so that nonliability, immunity, or release of the employee precludes recovery from the principal....

*Id.* at 300, 396 A.2d 255; *see also DiPino v. Davis,* 354 Md. at 48, 729 A.2d at 370 (1999) (stating, "Because that liability is derivative, ... recovery may not be had against the entity if the employee is found not to be liable or is released."); *Stokes v. Association of Indep. Taxi Operators, Inc.,* 248 Md. 690, 692, 237 A.2d 762 (1968). The Court of Appeals also addressed an employer's liability in *Stokes* and commented:

> To hold that the employer is liable because of the acts of its agent against whom no liability exists in favor of the person injured would result in holding appellee liable notwithstanding [appellee's] inability to have legal redress against the person causing [appellee's] injuries. Such a holding would, in our opinion, be entirely inconsistent with the rule in

Maryland to the extent it has been declared by our previous decisions. . . .

*Stokes,* 248 Md. at 692, 237 A.2d 762.

Because we found no liability on the part of Anderson, it follows that, as a matter of law, there can be no liability on the part of his employers, the State of Maryland and the BCPD, or the MCCB under the doctrine of respondeat superior.

■ Regarding Police Commissioner Thomas Frazier, appellant alleges that Anderson was acting as the agent, servant and/or employee of Frazier at the time of the incident. There is no allegation that Frazier was not acting in conformance with BCPD policy. "Suits against . . . government officials in their official capacities 'represent only another way of pleading an action against an entity of which an officer is an agent. . . .' " *Ashton v. Brown,* 339 Md. 70, 111, 660 A.2d 447 (1995) (quoting *Monell v. Department of Soc. Serv. of N.Y.,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 2035 n. 55, 56 L.Ed.2d 611 (1978)). As a result, " 'the real party in interest in an official-capacity suit is the governmental entity and not the named official. . . .' " *Id.* (quoting *Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 361, 116 L.Ed.2d 301 (1991)).

The claim against Frazier requires no separate consideration because he was sued in his official capacity, which is analytically the same as a suit against the City. *See Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985). Accordingly, we affirm the trial court's dismissal of appellant's complaints against the State, BCPD, MCCB, and Frazier.

## CONCLUSION

■ The question of whether an act of an employee is within the scope of employment is usually a matter for the jury. Nevertheless, when only one reasonable inference can be drawn from the undisputed material facts, the question is one of law for the court. The only reasonable inferences to be drawn from the undisputed material facts of the instant case are that Anderson was acting within the scope of his employ-

ment as a law enforcement officer at the time of the shooting, that his actions were reasonable, and that there was no agency between Sage and/or Sterling and Anderson at the moment of the shooting. Accordingly, summary judgment was properly granted in favor of Anderson, Sterling, and Sage. In addition, for the reasons stated above, the State, MCCB, BCPD, and Frazier were all properly dismissed from the case. We, therefore, affirm the judgments of the circuit court.

**JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.**