736 A.2d 1084

Mary WILLIAMS, Individually, etc., et al.

v.

MAYOR AND CITY COUNCIL OF BALTIMORE, et al.

No. 672, Sept. Term, 1998.

Court of Special Appeals of Maryland.

Sept. 7, 1999.

2

4

Howard J. Schulman and Joseph S. Kaufman (Schulman & Kaufman, L.L.C., on brief), Baltimore, for appellants.

William R. Phelan, Jr. (Frank C. Derr and Justin J. King, on the brief), Baltimore, for appellee, Mayor and City Council.

Bernard Ilkhanoff (Frank C. Derr, Eileen A. Carpenter, on the brief), Baltimore, for appellee, Edward Colbert.

Argued before MOYLAN, HARRELL and HOLLANDER, JJ.

MOYLAN, Judge.

The appellants, Mary Williams, *et al.,*[1] challenge two Orders of the Circuit Court for Baltimore City issued by Judge John C. Themelis and Judge Gary I. Strausberg, respectively, whereby 1) the appellants' claim against the Mayor and City Council of Baltimore was dismissed and 2) summary judgment was granted in favor of Baltimore City Police Officer Edward Colbert. On appeal, the appellants contend:

1. that the trial court erred in granting summary judgment in favor of Officer Colbert based on its finding that Officer Colbert was entitled to qualified immunity; and

2. that the Mayor and City Council of Baltimore are subject to suit for the actions of Baltimore City police officers under the Local Government Tort Claims Act.

## The Factual Background

The factual circumstances giving rise to this case are that as of July of 1995, eighteen-year-old Valerie Williams had been involved for approximately four years in an abusive relationship with Gerald Watkins. On the morning of July 19, Mary Williams, the mother of Valerie Williams, was at work when she received a frantic telephone call from her daughter. Arriving home and finding that Valerie had again been beaten by Watkins, Mary Williams called 911. Officer Colbert responded.

After arriving at the scene, Officer Colbert took statements from both Mary and Valerie Williams and was informed by both of a history of abuse suffered by Valerie at the hands of Watkins. Even as Officer Colbert was interviewing Valerie, Watkins telephoned the house and spoke to both Valerie and to her mother. At that point in the narrative, the parties' versions of events diverge dramatically. Because we are reviewing the trial court's granting of summary judgment in

---

1. The suit was filed on behalf of Mary Williams, individually; Mary Williams, as Personal Representative of the Estate of Valerie Williams; Mary Williams, as next friend and guardian of Myreq Watkins; and Leroy Williams, father of Valerie Williams, individually.

favor of Officer Colbert, we shall recount only Mary Williams's version of events, as we are required to view the facts, including all reasonable inferences deducible therefrom, in the light most favorable to the party against whom the court granted the judgment, to wit, in the light most favorable to the appellants.

According to the deposition of Mary Williams, Valerie informed her that in the course of Watkins's first telephone conversation, he threatened to come back to the house. He called a second time and Mary Williams herself picked up the phone. After learning that the caller was Watkins, Mary Williams briefly expressed her anger to him and then hung up the phone. By looking at the Caller I.D. box, she ascertained that he had called from the Alameda Liquor Store. She reported that fact to Officer Colbert, who dispatched a police car to that location. According to Mary Williams, Officer Colbert said to Valerie, "You stay here, I've got to call for a camera."

Mary Williams had a brief conversation with Officer Colbert about going to a neighboring house, that of the baby-sitter, so that she could pick up her grandson, Valerie's son by Gerald Watkins. With Officer Colbert's approval, she went and picked up the baby and then returned to 622 Melville Avenue. When she got back to the house with the baby, she noticed that Officer Colbert was no longer there. Valerie informed her that the officer "went out to the car." Mary Williams went out and spoke briefly to the officer, who was sitting in the police cruiser. After she said, "What's next?," he replied that he had to "write the report."

Mary Williams returned to the house. A few minutes later, she glanced out the window and saw Watkins running up the front steps. At that same time, she noticed that Officer Colbert was no longer parked in front of the house. Watkins kicked open the door and shot both Valerie and Mary Williams before turning the gun on and killing himself. Valerie Williams was killed as a result of the gunshot wounds. Mary Williams survived but is partially paralyzed. Myreq Williams,

Valerie's infant son by Watkins, was also present but was not injured in the course of the shooting.

## The Procedural Background

On November 6, 1996, the appellants filed a Complaint in the Circuit Court for Baltimore City against (1) the State of Maryland under the Maryland Tort Claims Act; (2) the Mayor and City Council of Baltimore under the Local Government Tort Claims Act; and (3) Officer Colbert. The Complaint specifically alleged that Article 27, § 11F and Baltimore City Police Department General Order 10–93 divested Officer Colbert of any discretion in carrying out his statutory duty to protect Valerie and Mary Williams and Myreq Watkins and mandated that he do so. The Complaint also alleged that Officer Colbert, through his actions and his express promise of protection, had established a "special relationship" with the appellants that imposed upon him a duty of protection beyond that which he would ordinarily owe to citizens threatened by crime.

On January 17, 1997, a hearing was held in the Circuit Court for Baltimore City, at the conclusion of which Judge Themelis dismissed the Complaints against both the State of Maryland[2] and the Mayor and City Council of Baltimore, ruling that neither could be sued under the respective tort claims acts.

On January 30, 1998, a hearing was held before Judge Strausberg on Officer Colbert's Motion for Summary Judgment. On February 27, Judge Strausberg granted the motion, ruling that, as a matter of law, Officer Colbert was acting in a discretionary capacity, without malice, at the time of the incident and was, therefore, entitled to qualified immunity as a government official.

## Special Focus on Former Art. 27, § 11F

The success or failure of the appellants' claim against Officer Colbert will be controlled by our interpretation of the

---

2. The appellants have not appealed the dismissal of their Complaint against the State of Maryland.

intended scope of a law enacted by the Legislature as Chapter 307 of the Acts of 1979 and codified as of the date of the assault in this case as Article 27, § 11F.[3] As of July 19, 1995, the critical date for our purposes, § 11F provided, in pertinent part:

(b) Assistance to victim.—(1) Any person who alleges to have been a victim of abuse and who believes there is a danger of serious and immediate injury to himself or herself may request the assistance of a local law enforcement agency.

(2) A local law enforcement officer responding to the request for assistance shall:

(i) Protect the complainant from harm when responding to the request; and

(ii) Accompany the complainant to the family home so that the complainant may remove:

1. The personal clothing of the complainant and of any child in the care of the complainant; and

2. The personal effects of the complainant and of any child in the care of the complainant that are required for the immediate needs of the complainant or the child.

(c) Immunity of law enforcement officer from civil liability. —Any law enforcement officer responding to such a request shall have the immunity from liability described under § 5–326 of the Courts and Judicial Proceedings Article.

With respect to that immunity referred to in subsection (c), Courts and Judicial Proceedings Article, § 5–326, in turn, provided: [4]

A law enforcement officer who responds to a request under Article 27, § 11F of the Code for assistance by an individual who alleges to have been a victim of spousal

---

3. With amendments not here pertinent, what had been Art. 27, § 11F is now, and has been since 1996, recodified as Art. 27, § 798.

4. The immunity provision is now codified as Courts Article, § 5-610.

assault shall be immune from civil liability in complying with the request *if the law enforcement officer acts in good faith and in a reasonable manner.*

(Emphasis supplied).

The appellants' critical reliance on what was then § 11F is two-fold. They claim first that that statutory provision imposes on a law enforcement officer responding to a domestic violence call a specific duty to protect a victim threatened with domestic violence above and beyond those duties ordinarily incumbent on a law enforcement officer responding to any other type of complaint or call for assistance. Intertwined with that first claim is the further subclaim that the statutory duty is so specific and so mandatory that the officer's function is thereby transformed from one that is ordinarily of a "discretionary" character into a mechanistic and merely "ministerial" function, a transformation that would *ipso facto* divest the officer of his accustomed immunity as a governmental official.

The second claim is that § 11F provides an officer responding to a domestic violence complaint with only a constricted immunity far less plenary than that enjoyed by law enforcement officers in performing other aspects of their duties. Ordinarily an officer, even if he be negligent in the performance of his duties, enjoys official immunity so long as he does not act maliciously. The appellants argue that, because of § 11F(c), Officer Colbert was divested of his ordinary government official immunity unless, in the special context of responding to a domestic violence call, he acted **not only** 1) non-maliciously **but also** 2) reasonably.

Before turning attention to those two alleged exceptions to the ordinary rule, it behooves us briefly to set out the context of the ordinary rules themselves. We must ask ourselves initially what the result in this case would have been if, on July 19, 1995, § 11F had not existed.

### Duty of Police Officers Generally

Generally, police officers do not, as an aspect of tort law, owe a duty of individualized protection to any particular

person. The duty of protection, rather, applies to the public as a whole. *Ashburn v. Anne Arundel County*, 306 Md. 617, 626–27, 510 A.2d 1078 (1986); *Holson v. State*, 99 Md.App. 411, 414, 637 A.2d 871 (1994); *Jones v. Maryland Nat'l Capital Park & Planning Comm'n*, 82 Md.App. 314, 325–26, 571 A.2d 859 (1990). The appellate courts in Maryland have on several occasions addressed the duty police officers owe to the public, most frequently in the context of handling drunken drivers. *Ashburn*, 306 Md. 617, 510 A.2d 1078; *Holson*, 99 Md.App. 411, 637 A.2d 871; *Jones*, 82 Md.App. 314, 571 A.2d 859. In *Ashburn*, the Court of Appeals recognized the general rule that,

> absent a "special relationship" between police and victim, *liability for failure to protect an individual citizen against injury caused by another citizen does not lie against police officers.* Rather, *the "duty" owed by the police by virtue of their positions as officers is a duty to protect the public,* and the breach of that duty is most properly actionable by the public in the form of criminal prosecution or administrative disposition.

306 Md. at 628–29, 510 A.2d 1078 (citations omitted; emphasis supplied).

The risk involved in attempting to hold police officers privately responsible for the negligent performance of their public duties was clearly pointed out by the Court of Appeals in *Ashburn*, 306 Md. at 629–30, 510 A.2d 1078:

> "*[I]f the police were held to a duty enforceable by each individual member of the public, then every complaint— whether real, imagined, or frivolous would raise the spectre of civil liability for failure to respond.* Rather than exercise reasoned discretion and evaluate each particular allegation on its own merits the police may well be pressured to make hasty arrests solely to eliminate the threat of personal prosecution by the putative victim. Such a result historically has been viewed, and rightly so, as untenable, unworkable and unwise."

(quoting *Morgan v. District of Columbia,* 468 A.2d 1306, 1311 (D.C.1983) (citation omitted)). The *Ashburn* Court further noted that

> a policy which places a duty on a police officer to insure the safety of each member of the community would create an unnecessary burden on the judicial system. Under such circumstances, the slightest error of a policeman would give rise to a potential law suit.
>
> Presently, the police officer is subject to disciplinary proceedings or criminal prosecution for any dereliction of duty, and these proceedings are better suited to review charges against the police officer for the breach of a duty which is his job, rather than his responsibility as a member of the public, imposes on him. Moreover, as stated by the District of Columbia Court of Appeals in *Morgan,*
>
>> while public prosecution does little to console those who suffer from the mistakes of police officials, on balance, the community is better served by a policy that both protects the exercise of law enforcement discretion and affords a means of review by those who, in supervisory roles, are best able to evaluate the conduct of their charges.

306 Md. at 630, 510 A.2d 1078 (citations omitted).

■ As a general proposition, Officer Colbert owed no special duty of protection enforceable in tort law to either Valerie or Mary Williams. Whether Officer Colbert by his words or actions in this case created a duty that otherwise would not have been his involves a distinct and fact-specific possible basis for finding a duty, which we will address *infra.* At the moment, we are simply establishing the framework for deciding whether § 11F itself statutorily and generically established an extraordinary duty of individualized protection in this special context that otherwise would not exist.

■ In the absence of § 11F, it is clear that there would have been no duty of particularized protection owed to either Valerie or Mary Williams. There could have been, therefore, no liability based on the allegedly negligent performance of a non-existent duty. As explained by this Court in *Jones v.*

*Maryland Nat'l Capital Park & Planning Comm'n,* 82 Md. App. at 320, 571 A.2d 859:

> Three basic elements are necessary to state a cause of action in negligence. *First, the defendant must be under a duty to protect the plaintiff from injury.* Second, the defendant must fail to discharge that duty. Third, the plaintiff must suffer actual loss or injury proximately resulting from that failure.

(Emphasis supplied); *see also Holson v. State,* 99 Md.App. at 414, 637 A.2d 871; *Lamb v. Hopkins,* 303 Md. 236, 492 A.2d 1297 (1985). Only after those three basic elements have been established can an individual be held liable in tort for his negligence.

In *W.Va. Central R. Co. v. Fuller,* 96 Md. 652, 666, 54 A. 669 (1903), Judge McSherry stated for the Court of Appeals over ninety years ago:

> [T]here can be no negligence where there is no duty that is due; for negligence is the breach of some duty that one person owes to another. It is consequently relative and can have no existence apart from some duty expressly or impliedly imposed. In every instance before negligence can be predicated on a given act, back of the act must be sought and found a duty to the individual complaining, the observance of which duty would have averted or avoided the injury.... As the duty owed varies with circumstances and with the relation to each other of the individuals concerned, so the alleged negligence varies, and *the act complained of never amounts to negligence in law or in fact; if there has been no breach of duty.*

(Emphasis supplied).

In *Ashburn,* 306 Md. at 627, 510 A.2d 1078, the Court of Appeals repeated that theme:

> Judge McSherry's comments remain viable today: *negligence is a breach of a duty owed to one, and absent that duty, there can be no negligence.*
>
> "Duty" in negligence has been defined as "an obligation, to which the law will give recognition and effect, to conform

*to a particular standard of conduct toward another."* Prosser and Keeton, supra, § 53. There is no set formula for this determination.... As one court suggested, there are a number of variables to be considered in determining if a duty exists to another, such as:

the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered the injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved.

(Citations omitted; emphasis supplied).

In the absence of § 11F, Officer Colbert owed no special duty of protection to any of the appellants that could serve as the basis for a successful tort action against him. Our further inquiry, therefore, will be whether the enactment of § 11F requires a different result.

### Immunity of Police Officers Generally

The second general context that must be established before we can decide whether § 11F created an extraordinary exception to the ordinary rule concerns the immunity from civil suit that is traditionally enjoyed by a law enforcement officer in the course of performing official duties. We must ask ourselves what Officer Colbert's immunity status would have been if, on July 19, 1995, § 11F had not existed.

 The seminal opinion setting out the required elements that must be established for an individual to enjoy immunity from liability as a public official is that by Judge Digges for the Court of Appeals in *James v. Prince George's County,* 288 Md. 315, 323–24, 418 A.2d 1173 (1980), *superseded by Rule on other grounds, Prince George's County v. Fitzhugh,* 308 Md. 384, 519 A.2d 1285 (1987):

Before a governmental representative in this State is relieved of liability for his negligent acts, it must be determined that the following independent factors *simultaneously* exist: (1) the individual actor, whose alleged negligent conduct is at issue, is a *public official* rather than a mere *government employee or agent;* and (2) his tortious conduct occurred while he was performing *discretionary,* as opposed to *ministerial,* acts in furtherance of his official duties. Once it is established that the individual is a public official *and* the tort was committed while performing a duty which involves the exercise of discretion, a qualified immunity attaches; namely, in the absence of malice, the individual involved is free from liability. The rationale underlying this grant of immunity "is that a public purpose is served by protecting officials when they act in an exercise of their discretion."

(Emphasis in original; footnote and citations omitted). *See also Duncan v. Koustenis,* 260 Md. 98, 104, 271 A.2d 547 (1970). *And see* the excellent discussion of public official immunity by Judge Eyler in *Thomas v. Annapolis,* 113 Md. App. 440, 450–57, 688 A.2d 448 (1997).

The Maryland case law establishes unequivocally that police officers in the course of their public duties are public officials within the contemplation of the qualified immunity law. Judge McWilliams stated in *Robinson v. Bd. of County Comm'rs,* 262 Md. 342, 346–47, 278 A.2d 71 (1971):

"In Maryland governmental immunity is extended to all non-malicious acts of public officials ... when acting in a discretionary ... capacity." ... *It is clear that policemen are "public officials" and that when they are within the scope of their law enforcement function they are clearly acting in a discretionary capacity.*

(Citations omitted; emphasis supplied).

Chief Judge Murphy wrote to the same effect in *Bradshaw v. Prince George's County,* 284 Md. 294, 302–03, 396 A.2d 255 (1979):

*We have held that a police officer is a "public official" when acting within the scope of his law enforcement function.* As a "public official," a police officer is protected by a qualified immunity against civil liability for non-malicious acts performed within the scope of his authority.

It is clear from these authorities that a police officer, to enjoy immunity, must act without malice and within the scope of his law enforcement function.

(Citations omitted; emphasis supplied).

In *Clea v. Mayor and City Council of Baltimore,* 312 Md. 662, 672, 541 A.2d 1303 (1988), the Court of Appeals reaffirmed that police officers are public officials:

In Maryland, *a limited category of governmental personnel, including police officers,* are entitled under certain circumstances to qualified immunity from tort liability for their negligent conduct.

(Emphasis supplied). In *Clea,* a Baltimore City police officer, after he led a team of eight armed officers in an egregious forcible entry into the family home of innocent persons, was sued for negligently having caused the search warrant to be executed at the wrong address. Notwithstanding the acknowledgment by the Court of Appeals that the "mistake may have been the product of negligence," 312 Md. at 679, 541 A.2d 1303, the opinion of Judge Eldridge held that the officer was nonetheless a public official performing a discretionary act and was, therefore, entitled to immunity so long as he had acted without malice:

It is undisputed in this case that *Officer Leonard was a public official* and that *his tortious conduct occurred while he was performing discretionary acts in furtherance of his official duties.* It is further conceded by the plaintiffs that the non-constitutional torts here alleged are all ones falling within the scope of the immunity if Officer Leonard acted without malice.

312 Md. at 673, 541 A.2d 1303 (emphasis supplied).

If a police officer is performing a discretionary act in the course of his official duties, the only qualifying limitation

on his otherwise plenary immunity from a suit for negligence is that his actions or omissions must have been non-malicious. As the Court of Appeals stated in *Ashburn v. Anne Arundel County*, 306 Md. 617, 622, 510 A.2d 1078 (1986):

Since *Cocking [v. Wade*, 87 Md. 529, 40 A. 104 (1898) ], the rule which we have applied to tort claims against a governmental representative is that the actor will be relieved of liability for his *non-malicious* acts where: (1) he "is a *public official* rather than a mere *government employee or agent;* and (2) his tortious conduct occurred while he was performing *discretionary,* as opposed to *ministerial,* acts in furtherance of his official duties."

(Emphasis in original). The Court then reaffirmed that a police officer "is a public official when acting within the scope of his law enforcement function." *Id.*

In *Williams v. Prince George's County*, 112 Md.App. 526, 550, 685 A.2d 884 (1996), Judge Davis spoke for this Court in stating that the actions of law enforcement officers in the course of their duties are discretionary acts and that only a showing of malice will defeat an officer's qualified immunity in the course of performing such acts:

Unquestionably, *the actions of police officers within the scope of their law enforcement function are quintessential discretionary acts. In the absence of any showing of malice, public officials* acting within the scope of their official duties while performing discretionary functions *are thus free from liability.*

(Citations omitted; emphasis supplied).

The principles undergirding the qualified immunity that normally shields a law enforcement officer in the performance of official duties were recently well summarized by Judge Adkins for this Court in *Lovelace v. Anderson*, 126 Md.App. 667, 692, 730 A.2d 774 (1999):

Unquestionably, *a law enforcement officer* is not a mere government employee; rather, the officer, under oath, *holds a continuing public duty which calls for the exercise of some portion of the sovereign power of the State.* Addition-

ally, *an officer who acts within the scope of employment is performing a discretionary act.* Thus, *a law enforcement officer is entitled to qualified public official immunity.* That immunity for Maryland police officers, as well as other public officials, is codified at Md.Code (1974, 1998 Repl.Vol.), § 5–511(b) of the Courts and Judicial Proceedings Article. This section provides:

> Immunity generally. —... an official of a governmental entity, while acting in a discretionary capacity, without malice and within the scope of the official's authority is immune as an official or individual from civil liability for any act or omission.

(Citation omitted; emphasis supplied).

Judge Adkins not only set forth the operative principles of qualified immunity law, she also provided a clear statement of the salutary purpose served by insuring such immunity for law enforcement officers:

> A cause of action against a police officer grounded in negligence often results in the officer asserting a defense of qualified immunity. *The purpose of granting an official immunity is to limit the deleterious effects that the risks of civil liability would otherwise have on the operations of government.* ... Conferring a qualified immunity upon a law enforcement officer allows the officer "the freedom to exercise fair judgment, protecting 'all but the plainly incompetent or those who knowingly violate the law.'" "Moreover, permitting unwarranted lawsuits against officers would entail substantial social costs including inhibition and fear of potential liability among peace officers and would further consume much of the officer's time preventing him or her from performing his or her duties." Thus, *the goal of official immunity is to halt most civil liability actions,* except those in which the official is clearly in violation of the law, *well in advance of the submission of facts to a fact finder.*

126 Md.App. at 689–90, 730 A.2d 774 (citations omitted; emphasis supplied).

■ When the affirmative conditions for qualified immunity are satisfied, the only qualifier limiting such immunity is the presence of malice on the part of the officer. With respect to the quality of malice necessary to defeat immunity, *Leese v. Baltimore County,* 64 Md.App. 442, 480, 497 A.2d 159 (1985) was clear:

> The actual malice needed to defeat official immunity requires "an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and wilfully injure the plaintiff."

*See also Lovelace v. Anderson,* 126 Md.App. 667, 730 A.2d 774, 788 (1999); *Branch v. McGeeney,* 123 Md.App. 330, 349, 718 A.2d 631 (1998); *Thomas v. Annapolis,* 113 Md.App. 440, 454–57, 688 A.2d 448 (1997); *Williams v. Prince George's County,* 112 Md.App. 526, 550–51, 685 A.2d 884 (1996); *Davis v. DiPino,* 99 Md.App. 282, 290–91, 637 A.2d 475 (1994), *rev'd on other grounds,* 337 Md. 642, 655 A.2d 401 (1995); *Arrington v. Moore,* 31 Md.App. 448, 464, 358 A.2d 909 (1976).

■ When Officer Colbert responded to the domestic violence call at 622 Melville Avenue on July 19, 1995, he indisputably was a governmental official exercising a portion of the sovereign power of the State. He indisputably was acting within the scope of his employment and, therefore, performing a discretionary act. There was, moreover, no remote suggestion that he was acting or failing to act with any sort of actual malice, with evil or rancorous motive influenced by hate, or with the purpose deliberately and wilfully to injure the appellants.[5]

---

**5.** Under no version of the events was there a scintilla of evidence to suggest any malice. In his Memorandum and Order, Judge Strausberg found:

> Concerning Officer Colbert's specific conduct, the facts show that he responded to the emergency call promptly. He arrived at the scene and proceeded to take statements from Mary and Valerie Williams concerning the assault. During the interview, Watkins made two phone calls to the house and spoke both with Valerie and Mary Williams. Mary Williams informed Officer Colbert about Watkins' location. Officer Colbert stated that he intended to call and send a patrol car to pick up Gerald Watkins. Officer Colbert also

In the absence of § 11F, therefore, Officer Colbert unquestionably would have enjoyed immunity from liability for any alleged negligence on his part. Our further inquiry, therefore, will be whether the enactment of § 11F requires a different result.

### The Inapplicability of Art. 27, § 11F
### To the Circumstances of this Case

With respect to both 1) the allegedly expanded duty of Officer Colbert to provide continuing protection to Valerie Williams and 2) the alleged diminution of the qualified immunity enjoyed by Officer Colbert as a government official, we hold that the enactment of § 11F had no effect whatsoever. As an examination of its legislative history readily reveals, § 11F deals with a very limited situation that was not at all involved in the present case.

There was prior to 1979 a sensitive and potentially dangerous situation, not clearly covered by any preexisting law, wherein the victim of a "spousal assault" (now a "victim of abuse") might need to request the assistance of a law enforcement officer. The "assistance" requested was for the officer to accompany the complainant to the "family home" in order to retrieve certain personal effects. Both the protection to be provided the complainant and the immunity to be provided the officer by the new law were in the course of "responding to

---

mentioned his intention to obtain a camera to photograph Valerie Williams' injuries. Officer Colbert, purportedly, made two phone calls to another unit or headquarters to obtain a camera, albeit without success. One half hour thereafter, Officer Colbert claims to have informed Mary Williams of his intention to pick up a camera himself. According to Officer Colbert, Mary Williams expressed no objection to his plans. Conversely, Mary Williams denies that Officer Colbert communicated this information to her, nor does she concede to have assented to have Officer Colbert leave the scene. Officer Colbert further denies having ordered the Plaintiffs to remain in their house, whereas Mary Williams insists that Officer Colbert affirmatively promised to care for them and instructed them to remain inside their home. Notwithstanding the factual discrepancies in the parties' accounts, the record shows no evidence of "malice."

the request for assistance." As originally enacted by Ch. 307 of the Acts of 1979, Art. 27, § 11F provided:

(a) Any person who alleges to have been a victim of spousal assault and who believes there is a danger of serious and immediate injury to himself or herself **may request the assistance** of a local law enforcement agency. A local law enforcement officer **responding to the request for assistance** shall:

(1) Protect the complainant from harm **when responding to the request**; and

(2) Accompany the complainant to the family home so that the complainant may remove his or her personal clothing and effects and also the personal clothing and effects of any children that may be in the care of the complainant. The personal effects to be removed shall be only those required for immediate needs.

(b) Any law enforcement officer **responding to such a request** shall be immune from civil liability **in complying with the request** as long as the officer acts in good faith and in a reasonable manner.

(Emphasis supplied).

Section 11F was obviously not a broad-scale attack on spousal abuse generally. Its exclusive concern was with implementing that one very particular "request for assistance." We know precisely what the "request for assistance" is limited to, because subsections (a)(1) and (a)(2) expressly direct what the officer shall do in "responding to the request for assistance." Section 11F clearly dealt with a very narrow and limited situation.

Between 1979 and July 19, 1995, the critical date for this case, only three changes had been made in § 11F, two of them inconsequential. There was a modest re-wording with respect to the "personal clothing" and "personal effects" which the "complainant," accompanied by the "law enforcement officer," might remove from "the family home." There was, however, no change whatsoever in substance. The second inconsequential change was that in 1979, § 11F expressly spelled out the

immunity provision, whereas by 1995 it simply made reference to § 5–326 of the Courts and Judicial Proceedings Article. Substantively, however, the immunity provision remained unchanged.

Between 1979 and 1995, however, there was one significant change with respect to the class of persons who were entitled to the assistance of the law enforcement officer. As originally enacted, the law only extended special assistance to a person who alleged that he or she had been "a victim of spousal assault." Ch. 728 of the Acts of 1994 broadened the class of persons entitled to assistance under § 11F. That Act changed the subtitle of § 11F from "Spousal Assault" to "Domestic Violence." The Act broadened the class of those entitled to assistance from "victim[s] of spousal assault" to "victim[s] of abuse." A "victim" was, in turn, defined as a "person eligible for relief" under § 4–501(h) of the Family Law Article.

By virtue of that change, Valerie Williams came within the ambit of persons entitled to police assistance in retrieving personal effects from "the family home." Prior to the change, she would not have been so entitled, for she was not and never had been the legal spouse of Gerald Watkins. Her entitlement to such assistance under the post–1994 expanded coverage was only by virtue of the fact that she was, as of July 19, 1995, "an individual who [had had] a child in common with" Gerald Watkins. Family Law Article, § 4–501(h)(6).

As we turn our attention to the situational applicability of § 11F to the events of July 19, 1995, we note that both 1) the provision requiring that the officer "protect the complainant from harm when responding to the request" and 2) the provision conferring immunity from civil liability on an "officer responding to such a request" are substantively the same today as they were when the law was originally enacted to cover cases of "spousal assault." It was in that context of spousal assault that what became § 11F was enacted to deal with a particular situation not clearly covered, if covered at all, by existing law.

What was, in Holmes's words, the "felt necessity of the time" to which § 11F was the response? In the context of spousal abuse, two closely related situations were particularly perplexing with respect to both 1) the responsibility of the police to take some action and 2) the authority of the police to take action. Those situations were: 1) where the fighting spouses were still inside the family home but where someone had called for assistance and 2) where one of the spouses had thrown the other out of the family home and where re-entry by the expelled spouse was desired but fraught with potential peril. An officer, of course, could always make a warrantless arrest for a crime, assaultive or otherwise, committed in his presence. Beyond that, however, the police authority to intervene in a family fight was highly problematic. Once the violence had actually subsided, the aggrieved spouse, out on the street or otherwise, was generally left with no recourse but to go to District Court and to apply for a warrant of arrest. The police officer was powerless to help.

The sponsors and other supporters of what became Ch. 307 of the Acts of 1979 sought to alleviate the plight of the spousal assault victim by broadening both the obligation and the authority of the police to intervene warrantlessly. Even when the violence had actually subsided prior to the arrival of the police, the spousal situation frequently remained turbulent and one where tempers could suddenly flare. The proponents of the Bill sought to make certain that the officer was not required to leave the scene as soon as the situation had been momentarily tranquilized. The original version of the Bill provided that the officer would: 1) advise the victim with respect to available sources of shelter, medical care, counseling, and other services; 2) transport the victim to such facilities where appropriate; and 3) accompany the victim back to the "family home" to retrieve clothing and other personal effects. Self-evidently, the officer had both the obligation and the authority to "protect the complainant from harm when responding to the request." The original Preamble to House Bill 53 reflected that broad range of police responsibilities beyond ordinary police work:

For the purpose of establishing an emergency procedure available to victims of spousal violence in order to *inform them of services available, provide transportation, and provide protection so that they may return safely to the family home in order to remove certain necessary personal property;* establish an emergency procedure for the protection of children during incidents of spousal violence; coordinating certain statutory provisions; defining certain terms; and relating generally to spousal violence.

(Emphasis supplied).

The police response to that initial version of the Bill was, albeit approving of the Bill in principle, to admonish the Legislature that too much responsibility was being placed on the police of a sort that was beyond the scope of ordinary police work. A joint committee representing the Maryland Chiefs of Police Association; the Maryland Law Enforcement Officers, Inc.; the Maryland Sheriff's Association; and the Maryland Municipal League wrote to the House Judiciary Committee and recommended that the police responsibility be scaled back:

The Committee believed that the enactment of *the bill in its present form would result in a severe manpower drain on police departments,* which might result to the detriment of the general public in other matters urgently requiring police assistance. Another practical difficulty the police envisioned would be that juvenile authorities and social service agencies would not be available during the evening hours or weekends when action by these agencies would be necessary. The Committee felt that *police participation in spousal violence situations is appropriate where violence exists,* however, *the remainder of the problem is one for social agencies. The Committee would approve the concept of the bill but oppose some of the obligations imposed upon police departments by the bill.*

(Emphasis supplied).

House Bill 53 was subsequently amended so as to scale back the list of extraordinary police responsibilities from three to

one. The one that remained, the ultimate thrust of § 11F, was, upon request, to accompany a spouse who had fled or been thrown out of the "family home" back to the "family home" for the exclusive purpose of retrieving clothing and other personal effects required for immediate needs. The Preamble to House Bill 53 in its final form read as follows:

> For the purpose of *authorizing law enforcement officers to provide protection for victims of spousal assault and assistance in removing certain personal property from the family home; and providing immunity from liability for officers carrying out the provisions of this Act.*

(Emphasis supplied).

The express purpose of the Bill stated in that Preamble was to provide the authorization for certain police activity that otherwise may well have been beyond the scope of traditional police authority. The key word in that Preamble is **"authorizing."** The police were authorized to provide to certain eligible "spouses" (now "victims of abuse") "protection . . . and assistance in removing certain personal property from the family home." That authority had theretofore been lacking or was, at best, murky.

██ The purpose of § 11F clearly is not to provide a continuing victim protection program wherever and whenever victims may be.[6] Section 11F, rather, authorizes the police to accompany and to protect the victim of abuse when returning to the "family home"[7] for the limited purpose of retrieving

---

6. A continuing victim protection program is clearly not provided by § 11F and is self-evidently not feasible. How long would it last? An hour? A day? A week? A year? Would it involve three shifts of police officers a day, even before provision is made for weekend coverage? Would it apply only at home? Or at work? Or in moving about the city? The concept is absurd. The direction to "[p]rotect the complainant from harm" is qualified by the temporal limitation "when responding to the request for assistance."

7. Although the 1994 Amendment broadened the class of persons entitled to police assistance from "spouses" to "victims of abuse," the subsequent place to which the complainant was to be accompanied by the police remained "the family home."

clothing and other personal effects required for immediate needs. The sponsor of House Bill 53 was Delegate Ida Ruben of Montgomery County. Her explanation of the purpose of the Bill was transparently clear:

When domestic violence occurs, the usual procedures available immediately after the fact are not satisfactory for the victims, for the police or for the courts. *This Bill is a result of my concern for a person who has been abused at home, thrown out of the home, or forced to run from the home and has no place to turn for help.*

(Emphasis supplied). Delegate Ruben went on:

*All this Bill asks for is emergency assistance for such people to enter their own homes and take a few of their personal belongings so that they can exist for a short time elsewhere until a longer term resolution of their problems can proceed in an orderly way.* Better still, if this gives people a chance to resolve their own problems before matters get out of hand, more of these marriages might be salvaged. *Most of these victims do not have money in their pockets at the time of the crisis in order to get out and buy duplicates of their clothing and other necessities. They may have children with them for whom they need clothing, medications or essential documents.*

(Emphasis supplied).

A key witness testifying in favor of House Bill 53 was Katherine Foss, of the Prince George's County Department of Social Services. Her concern was clearly a concern for women who had been forced out of their homes and who feared violence if they returned to the home without the benefit of police protection:

*The large majority of* [women who participated in their emergency shelter program over the last year] *left home with nothing but the clothes on their backs. In all cases the women were extremely fearful. They were fearful to return home and fearful that if they left home all their possessions would be lost.*

*In many cases, when the woman has returned home she has found that her clothes have been ripped apart or thrown out.* In one case, the husband set fire to the apartment; in another case the husband removed his wife's belongings from the house and burned them. Many times she finds upon returning home that her husband has changed the locks to the house or apartment and the landlord refuses to allow her entrance, even though her name is on the lease and she may have been paying rent. . . .

*This destruction is particularly wasteful and costly in view of the fact that the department often must issue an emergency grant to provide such victims with basic necessities such as clothing.* If a Public Assistance Grant is necessary, the application process is impeded by her lack of verifying documents, birth certificates, rent receipts, etc.

(Emphasis supplied).

It was also deemed desirable for House Bill 53, and ultimately § 11F, to make certain that the police, newly obligated to assume this arguably extraordinary responsibility, did not find themselves unexpectedly bereft of their traditional immunity. The fear was that if they were acting beyond the scope of normal police authority, that non-traditional activity might divest them of the immunity ordinarily available to government officials when acting in the course of their more familiar employment. Before the House Judiciary Committee, Assistant State's Attorney Stephen Montanarelli of Baltimore County testified that without the new law, there was no legal basis for the police to accompany a spouse back to the family home and that such an action might, therefore, be *ultra vires:*

[It is] discretionary for police in Baltimore County to accompany spouse to get clothes. *This bill would give spouse a right to have police accompany her.*

*[There is] no legal basis for police to accompany spouse now.* If [a] woman says she was threatened, there is an assault. An assault is a misdemeanor. Police cannot arrest

for a misdemeanor unless he observes misdemeanor. Therefore, [the] woman must swear out warrant.

(Emphasis supplied).

The letter from the Joint Committee of Law Enforcement Agencies to the House Judiciary Committee similarly referred to the lack of statutory authority for the police to provide certain types of assistance to spousal assault victims:

Some of the services set forth in the bill to be performed by police are at the present time being performed *despite the lack of specific statutory authority.*

(Emphasis supplied).

The testimony before the House Judiciary Committee of Katherine Foss also referred to the police belief that they lacked the authority to accompany an abused spouse back to her home:

Emergency Shelter staff find that *the police* are powerless to offer much assistance. They *are reluctant to accompany the woman to her home, claiming lack of authority or that it is not part of their job.* The police cannot arrest an abusing husband unless he actually witnesses the abusive incident.

(Emphasis supplied).

If the police were acting without statutory authority, there might arguably be some cloud on their entitlement to public official immunity. The double-barreled legislative response was 1) to provide the statutory authority and 2) to make certain that there was immunity.

We hold that in enacting the immunity provision of Ch. 307 of the Acts of 1979, it clearly was not the legislative intent to diminish or to curtail in any way the qualified immunity otherwise enjoyed by a law enforcement officer as a governmental official.[8] It was, rather, the clear and sole

---

8. Under the circumstances, it is not even necessary to consider the further impediment to any diminution of qualified immunity that public official immunity is a common-law concept, *Thomas v. Annapolis,* 113

intent of that provision, probably redundantly, to make doubly certain that police officers, called upon by the Act to perform an arguably extraordinary function beyond the scope of their routine duties, would not unintentionally be stripped of their accustomed immunity. The mathematical function which the Legislature intended to apply to public official immunity was addition, if necessary, and not subtraction.

### Section 11F Had No Pertinence
### To the Situation in this Case

Section 11F has no bearing on this appeal because it deals with a very limited situation that was not here involved. Valerie Williams never requested the assistance of Officer Colbert to accompany her back to a "family home" she had theretofore shared with Gerald Watkins. She obviously did not, for there was not and never had been any such "family home." Valerie Williams and Gerald Watkins had never cohabitated. On July 19, 1995, she had not fled nor been driven from a "family home" to which she then needed to return, with police protection, to retrieve articles of clothing or other personal effects. The special circumstance contemplated by § 11F was not present in this case.

Officer Colbert, rather, responded to the 911 call from 622 Melville Avenue on July 19, 1995 exactly as he would have responded to any other 911 call reporting any other crime. He responded to Valerie Williams's report of a recent assault at the hands of Gerald Watkins exactly as he would have responded to that same report even if Valerie Williams and Gerald Watkins had never parented a child together. He responded to Mary Williams's complaint that her daughter had just been battered by her ex-boyfriend exactly as he would have responded to a complaint by Mary Williams that her son had just been battered by the neighborhood bully.

---

Md.App. 440, 450–57, 688 A.2d 448 (1997), and that the common law may not be repealed by implication.

He responded to a crime scene, made out a report of the crime, learned the location of the assailant, dispatched a car to pick up the assailant, and sent for a camera to memorialize the evidence of the beating suffered by Valerie Williams. Those were classically the discretionary acts of a police officer performing his investigative duties as a public official. Because nothing he did was remotely malicious, Officer Colbert enjoyed, therefore, public official immunity for any arguable negligence on his part in the performance of those duties.

## Did Officer Colbert Create
## A "Special Relationship" With the Victim?

Our holding that § 11F does not apply to the circumstances of this case and could not, therefore, itself have created a duty to provide individualized protection owed by Officer Colbert to Valerie Williams is not dispositive of whether such duty a might not have been created by some other modality. Completely irrespective of § 11F, a police officer may, by word or deed, create a "special relationship" with a citizen giving rise to a duty of individualized protection.

With respect to the general non-existence of such duty absent some "special relationship" between the officer and the victim, *Ashburn v. Anne Arundel Co.*, 306 Md. 617, 628, 510 A.2d 1078 (1986), first stated the norm:

> *[T]here is no duty to control a third person's conduct so as to prevent personal harm to another, unless a "special relationship" exists* either between the actor and the third person or between the actor and the person injured.

> [W]e recognize the general rule, as do most courts, that *absent a "special relationship" between police and victim, liability for failure to protect an individual* citizen against injury caused by another citizen *does not lie against police officers.*

(Citations omitted; emphasis supplied).

*Ashburn* then went on to describe the "special relationship" which, if relied upon, may serve as an exception to the general rule:

A proper plaintiff, however, is not without recourse. *If he alleges sufficient facts to show that the defendant policeman created a "special relationship" with him upon which he relied, he may maintain his action in negligence.* This "special duty rule," as it has been termed by the courts, is nothing more than a modified application of the principle that although generally there is no duty in negligence terms to act for the benefit of any particular person, *when one does indeed act for the benefit of another, he must act in a reasonable manner.* In order for a special relationship between police officer and victim to be found, *it must be shown that* the local government or *the police officer affirmatively acted to protect the specific victim* or a specific group of individuals like the victim, *thereby inducing the victim's specific reliance upon the police protection.*

306 Md. at 530–31, 510 A.2d 546 (citations omitted; emphasis supplied).

As we turn our attention to the question of whether there was any "special relationship" between Officer Colbert and Valerie Williams, we hasten to add that this possible basis for the finding of a duty to provide individualized protection is independent of and has absolutely nothing to do with § 11F. A "special relationship" could conceivably have been created between Officer Colbert and Mary Williams, clearly not herself a "victim of abuse" within the contemplation of § 11F, even if Valerie Williams had not been on the scene. A "special relationship" could conceivably have been created between Officer Colbert and Valerie Williams herself even if Valerie Williams had never parented a child with Gerald Watkins and would not have qualified, therefore, as a "victim of abuse" within the contemplation of § 11F. A "special relationship" could conceivably have been created between Officer Colbert and Mary Williams even if Mary Williams had called to report that the neighborhood bully had battered her son and had threatened to return to the home and repeat the battery. A "special relationship" could be created between Officer Colbert and anyone in contexts far removed from that of "domestic violence." The "special relationship" basis for the finding of a

duty to protect has absolutely nothing to do with § 11F and a discussion that wanders back and forth between two very distinct and unrelated possible predicates is misleading.

In terms of whether such a "special relationship" existed between Officer Colbert and either Valerie Williams or Mary Williams, the facts as recounted by Officer Colbert in his deposition would suggest nothing approaching the creation of such a "special relationship." That, of course, is beside the point, for, in assessing the propriety of the grant of summary judgment in favor of Officer Colbert, we must take that version of the facts most favorable to the appellants.

Even under that most favorable version, the facts as described by Mary Williams in her deposition, the existence of a "special relationship" was highly dubious. The only desire to leave 622 Melville Avenue ever expressed by Mary Williams to Officer Colbert was for the immediate purpose of going to the baby-sitter's neighboring house to get her infant grandson and then to return immediately with the grandson to 622 Melville Avenue. With Officer Colbert's full acquiescence, Mary Williams did just that, an action by her somewhat incompatible with a fear on her part that 622 Melville Avenue was the epicenter of possible danger.

Mary Williams did state that Officer Colbert wanted Valerie Williams to stay put until a camera could be procured to take her picture, but that statement on his part was not in response to any expressed desire on the part of Valerie Williams to leave the house and was not accompanied by any promise or reassurance by Officer Colbert that flight was unnecessary because he would be there to provide protection. He was directing his investigation and not reassuring either Mary or Valerie Williams that they had nothing to fear because he was there to protect them.

Mary Williams stated that when she later stepped out front to speak to Officer Colbert as he was sitting in a police cruiser, his only statement about remaining there was for the express purpose of finishing the writing of his report. The subsequent fear for her life and the attendant panic described

by Mary Williams was a state of mind that only arose after her daughter informed her that Gerald Watkins had threatened to kill her. That report from daughter to mother only came after Officer Colbert had already left the house and after the last conversation between Mary Williams and Officer Colbert had concluded. There was, in the language of *Ashburn,* no direct reference to "the police officer's affirmatively [having] acted to protect the specific victim" or to "the victim's specific reliance upon the police protection" as the reason for not leaving 622 Melville Avenue.

In the last analysis, however, it is not necessary to decide whether the deposition of Mary Williams even constitutes that minimal case from which, inferentially, a genuine dispute of material fact might arise. Even if, *arguendo,* we assume 1) that something said or done by Officer Colbert could have given rise to an implied promise that he would remain on the scene to provide continuing protection to Valerie and Mary Williams, and 2) that in reliance on such an implied promise, they remained in harm's way under circumstances where otherwise they would have left, the subsequent leaving of the scene by Officer Colbert would have been, at worst, a non-malicious act of negligence on his part. Even had that been the case, he would still have enjoyed immunity from civil suit as a public official acting in the course of his official duties. We affirm Judge Strausberg's granting of summary judgment in favor of Officer Colbert.

### The Dismissal of the Complaint
### Against the City of Baltimore

The appellants also contend that Judge Themelis was in error on January 17, 1997 when he dismissed their claim against the Mayor and City Council of Baltimore. In four of the counts of the Complaint, the appellants had charged that Baltimore City was liable pursuant to the Local Government Tort Claims Act, now codified as Md. Cts. & Jud. Proc. Art., § 5–301 *et seq.* We hold that Judge Themelis was not in error in dismissing the Complaint against the Mayor and City Council of Baltimore.

Although the appellants in their brief before this Court disclaim reliance on any theory that the City of Baltimore was "vicariously liable" for the alleged tort of Officer Colbert, the substance of the four counts they leveled against Baltimore City belies that disclaimer. They do not attribute the injuries to the appellants to any broad governmental policy of the City itself. They simply charge the City with responsibility for the alleged negligence of its alleged employee.

■ No extended discussion of this contention raised by the appellants is necessary because the Complaint against the City of Baltimore demonstrably lacks vitality for four or five separate and independent reasons. In the first place, Officer Colbert, as a member of the Baltimore City Police Department, was not, for tort liability purposes, an employee of Baltimore City. It is the clear holding of *Clea v. City of Baltimore*, 312 Md. 662, 669–70, 541 A.2d 1303 (1988), that the Baltimore City Police Department is a state agency and that, for tort liability purposes, a member of the Baltimore City Police Department is an employee of the State of Maryland and not of the City of Baltimore:

> In light of the cases in this Court holding that *the Baltimore City Police Department is a state agency for purposes of respondeat superior liability,* and the General Assembly's continued adherence to the Department's classification as a state agency, it is clear that the Mayor and City Council of *Baltimore would not be liable for Officer Leonard's alleged tortious conduct.* As a matter of Maryland law, *Baltimore City was simply not Officer Leonard's employer for tort liability purposes.* Apart from any other issues, Baltimore City was entitled to a judgment for this reason. On this ground, we shall affirm the judgment in favor of the Mayor and City Council of Baltimore.

(Emphasis supplied).

■ Even if, *arguendo,* a Baltimore City police officer could be deemed an employee of Baltimore City for tort liability purposes, the City of Baltimore still could not be sued directly, as it was in this case, and the suit against it was

properly dismissed. The Local Government Tort Claims Act (LGTCA) essentially established a set of legal entitlements and legal obligations between the municipalities and their employees, not between the municipalities and citizens at large. The LGTCA, on which the appellants rely, did not authorize bringing a suit directly against Baltimore City. As this Court noted in *Khawaja v. City of Rockville,* 89 Md.App. 314, 326, 598 A.2d 489 (1991):

> The Act, however, does not *create* liability on the part of the local government as a party to the suit.

(Emphasis in original). In *Williams v. Prince George's County,* 112 Md.App. 526, 554, 685 A.2d 884 (1996), Judge Davis similarly observed for this Court:

> The LGTCA ... does not authorize the maintenance of a suit directly against the local government.

In *Williams v. Montgomery County,* 123 Md.App. 119, 126, 716 A.2d 1100 (1998), Judge Salmon similarly observed:

> [U]nder the LGTCA, a plaintiff may not sue a local government, such as Montgomery County, directly but must sue, instead, the employee.

Yet a third reason why the Complaint against the City of Baltimore was properly dismissed is the sovereign or governmental immunity enjoyed by it. The LGTCA did not waive any governmental immunity enjoyed by the City against citizens at large. It waived only that immunity which the City might have asserted in an effort to avoid its responsibility to defend and to indemnify its employees. Cts. & Jud. Proc. Art., § 5–303(b)(2) provides:

> A local government may not assert governmental or sovereign immunity to avoid the duty to defend or indemnify an employee established in this subsection.

*Khawaja v. City of Rockville,* 89 Md.App. at 325–26, 598 A.2d 489, explained the limited extent of that waiver of governmental immunity:

> *The LGTCA, by its own terms, contains no specific waiver of governmental immunity when a governmental entity is*

*sued in its own capacity.* Viewing the LGTCA in light of its statement of purpose, *the LGTCA waives only those immunities the government could have in an action raised against its employee.* The statute requires the government to assume financial responsibility for a judgment against its employee by abolishing that immunity the government may have had against responsibility for the acts of its employees.
(Emphasis supplied). In *Williams v. Montgomery County,* 123 Md.App. at 126, 716 A.2d 1100, we similarly commented on the limited nature of any waiver of any governmental immunity under the LGTCA:

> *Appellant begins his argument by asserting that the LGTCA "waives governmental or sovereign immunity" when the plaintiff complies with the Act. This technically is untrue.* Although *the LGTCA does not waive governmental immunity,* it does serve the useful function of protecting "local government employees from suit and judgments on alleged torts committed by them within the scope of their employment, in order to maintain their incentive to perform to the best of their abilities."

(Citations omitted; emphasis supplied).

■ A fourth reason why the Complaint against Baltimore City was properly dismissed is that because Baltimore City was, in effect, charged with vicarious liability for the alleged tort of Officer Colbert, it was entitled, vicariously, to the same public official immunity defense successfully interposed by Officer Colbert. Cts. & Jud. Proc. Art., § 5–303(d) provides, in pertinent part:

> [T]his subtitle *does not waive any common law* or statutory defense or *immunity* in existence as of June 30, 1987, and *possessed by an employee of a local government.*

(Emphasis supplied). Subsection (e) goes on to provide:

> *A local government may assert on its own behalf any common law* or statutory defense or *immunity* in existence as of June 30, 1987, and *possessed by its employee* for whose tortious act or omission the claim against the local government is premised and *a local government may only be held*

*liable to the extent that a judgment could have been rendered against such an employee* under this subtitle.

(Emphasis supplied).

*Williams v. Prince George's County,* 112 Md.App. at 551–52, 685 A.2d 884, observed with respect to the entitlement of the governmental entity to raise any immunity available to the governmental employee:

> Pursuant to the Local Government Tort Claims Act (LGTCA) Md.Code Ann., Cts. & Jud. Proc., *the County is given the benefit of its employees'* defenses and *immunities.*
>
> . . .
>
> Thus *the County* cannot be vicariously liable for the officer's conduct because it *can raise the officer's defense of immunity,* pursuant to Md.Code Ann., Cts. & Jud. Proc. § 5–321(b)(1).

(Emphasis supplied).

In this same regard, Judge Eyler observed for this Court in *Thomas v. Annapolis,* 113 Md.App. 440, 458, 688 A.2d 448 (1997):

> [T]he local government may assert any common law or statutory defense of immunity in existence as of June 30, 1987 and possessed by the employee. Relevant to this discussion, *the governmental entity may,* as a consequence, *assert common law public official immunity as a defense if possessed by an employee.*

(Emphasis supplied).

■ A fifth reason why the Complaint against Baltimore City was properly dismissed is that the ultimate situation contemplated by the LGTCA never came to pass. As an intermediate procedural obligation of the LGTCA, the governmental entity for which he worked was obligated to provide a legal defense for Officer Colbert when he was charged with a tortious act or omission committed "within the scope of [his] employment." Whether required to by *Clea v. City of Balti-*

*more* or not, the City of Baltimore assumed that obligation of providing a legal defense.

The primary thrust of the LGTCA is that **if liability is established** and **if a judgment is obtained** against the governmental employee, that judgment must be executed against the governmental entity rather than against the employee. Section 5–303(b)(1) provides, in pertinent part:

> [A] local government shall be liable for any judgment against its employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment with the local government.

*Williams v. Montgomery County,* 123 Md.App. at 126, 716 A.2d 1100, explained:

> Under the LGTCA, local government entities are obligated to defend their employees for job-related tort claims. The Act prohibits direct execution of judgment against those employees absent proof of actual malice. In the absence of malice, *the Act forces successful plaintiffs to execute their judgment against the local government instead of against the employees.*

(Citations omitted; emphasis supplied).

That situation, however, never came to pass. The appellants were not successful plaintiffs. No judgment was ever obtained against Officer Colbert. There was no judgment, therefore, that could be executed against the City of Baltimore. The situation in this case is exactly as it was in *Williams v. Prince George's County,* 112 Md.App. at 552, 685 A.2d 884:

> Section [5–303(b)(1)] of LGTCA provides that "a local government shall be liable for any judgment against its employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment with the local government." *In the case sub judice, there has been no judgment against any "civilian employee";*

*thus, Prince George's County has no liability under § [5–303(b)(1)].*

(Emphasis supplied).

The dismissal of the Complaint against the City of Baltimore was not in error.

***JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANTS.***